DAVID C. SHONKA
Acting General Counsel
MEGAN COX
ALLISON M. LEFRAK
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mailstop CC-8256
Washington, DC 20580
Telephone: (202) 326-2282 (Cox)
Telephone: (202) 326-2804 (Lefrak)
Facsimile: (202) 326-3392
Email: mcox1@ftc.gov, alefrak@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

ADAM PAUL LAXALT
Attorney General
JOHN R. MCGLAMERY
LAURA TUCKER
Deputy Attorneys General, Bureau of Consumer Protection
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Phone (775) 684-1169
Facsimile: (775) 684-1170
Email: JmcGlamery@ag.nv.gov, LMTucker@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION | ) |
| and | ) Case No: |
| STATE OF NEVADA, | ) |
| Plaintiffs, | ) |
| v. | ) |
| EMP MEDIA, INC. (also d/b/a MYEX.COM, also d/b/a POST MY AD, also d/b/a, T & A MEDIA, also d/b/a INTERNET SECRETS), a Nevada corporation, | ) **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| ANIELLO "NEIL" INFANTE, individually and as an officer of EMP MEDIA INC., | ) |
| SHAD "JOHN" APPLEGATE, also known | ) |

1

as SHAD COTTELLI, individually and as an )
officer of EMP MEDIA INC., and            )
                                          )
ONE OR MORE UNKNOWN PARTIES               )
DOING BUSINESS AS YEICOX LTD.,            )
                                          )
                        Defendants,       )

_____

   Plaintiffs, the Federal Trade Commission and the State of Nevada, by and through its

counsel and Attorney General, for their Complaint allege:

1.  The FTC brings this action under Section 13(b) of the Federal Trade Commission Act

    ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive

    relief, rescission or reformation of contracts, restitution, the refund of monies paid,

    disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or

    practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with

    Defendants' unfair public disclosure of consumers' personal information.

2.  The State of Nevada, by and through the Office of the Attorney General, Adam Paul Laxalt,

    and its Bureau of Consumer Protection ("BCP"), John R. McGlamery, Deputy Attorney

    General, brings this action pursuant to the Deceptive Trade provisions of Chapter 598 of the

    Nevada Revised Statutes, to secure temporary, preliminary, and permanent injunctive relief,

    restitution, and other equitable relief.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345,

    and 15 U.S.C. §§ 45(a) and 53(b) with respect to the federal law claims, and by 28 U.S.C.

    1367 with respect to the supplemental state law claims of the State of Nevada.

4.  Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (c)(2), (c)(3), and 15 U.S.C.

    § 53(b).

**PLAINTIFFS**

5.  The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

7.  Plaintiff State of Nevada is one of the 50 sovereign states of the United States.  Plaintiff State of Nevada, by and through the Office of the Attorney General, Adam Paul Laxalt, and its BCP, John R. McGlamery, Deputy Attorney General, brings this action under the Deceptive Trade provisions of Chapter 598 of the Nevada Revised Statutes.  This Court has supplemental jurisdiction over plaintiff Nevada's state claims under 28 U.S.C. § 1367.

**DEFENDANTS**

8.  Defendant EMP Media, Inc. ("EMP") was a Nevada corporation with its principal place of business at 6130 Flamingo Road #732, Las Vegas, Nevada, 89103.  EMP (also d/b/a MyEx.com, d/b/a Post My Ad, d/b/a T & A Media, d/b/a Internet Secrets) has transacted business in this district and throughout the United States.  A certificate of dissolution was effective with the Nevada Secretary of State on July 7, 2016.

9.  Defendant Aniello "Neil" Infante ("Defendant Infante") signed EMP's articles of incorporation, and was EMP's president (September 2008 and from August 2015 through dissolution in July 2016); secretary (September 2008 through October 2012, and August 2015 through dissolution in July 2016); treasurer (September 2008 through May 2010, and

3

August 2015 through dissolution in July 2016); and director (September 2008 through October 2012, and August 2015 through dissolution in July 2016); as well as the registered agent for the corporation (2008 through October 2010, and August 2015 through dissolution). From approximately 2008 through the summer of 2016, Defendant Infante obtained, enabled, and facilitated a merchant processing account for EMP, which allowed EMP to accept credit card payments—a significant source of revenue for EMP. Defendant Infante also wrote checks and wired money from and to EMP's bank accounts from at least 2009 through at least 2013. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMP, including the acts and practices set forth in this Complaint. Defendant Infante, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

10. Defendant Shad "John" Applegate ("Defendant Applegate" or "Shad Applegate"), also known as Shad Cottelli, was EMP's president (October 2012 through March 2013); secretary (October 2012 through March 2014, and April 2014 through July 2015); treasurer (May 2010 through January 2014); and director (October 2012 through March 2014). At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMP, including the acts and practices set forth in this Complaint. Defendant Applegate, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

11. One or More Unknown Parties Doing Business as Yeicox Ltd. ("Unknown Parties") or one or more individuals or entities whose identities and addresses are unknown to the

Commission and the State of Nevada at this time.  At all times material to this Complaint,

acting alone or in concert with others, the Unknown Parties formulated, directed, controlled,

had the authority to control, or participated in the acts and practices of EMP, Yeicox Ltd., or

some other unknown entity, including the acts and practices set forth in this Complaint.

## COMMERCE

12. At all times material to this Complaint, Defendants have maintained a substantial course of

trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15

U.S.C. § 44.

## SUMMARY OF DEFENDANTS' BUSINESS ACTIVITIES

13. Defendants' website—MyEx.com—is dedicated solely to revenge porn.  "Revenge porn" —

or nonconsensual pornography—is the disclosure of sexually explicit images of an individual

without their consent.  Nonconsensual pornography causes immediate, devastating, and in

many cases irreversible harm to the victims.

14. Defendants solicit intimate pictures and videos for the website together with personal

information of the victims, including full name, age, address, employer, phone number,

social media account information, and email address, without the victims' consent.  The site

has also extorted victims by requiring them to pay fees of hundreds of dollars to have their

intimate pictures, videos, and information removed from the site.

15. Anyone with Internet access can view the images and personal information on the site, and

share it.  These images can dominate search engine results for the victim's name, are publicly

available, and have often been associated with the victim's social media presence.  As a

result, the victim's family, friends, and even employer can view the images.  The posting of

the intimate images and personal information often leads MyEx.com visitors to engage in

5

direct contact with victims and post crude commentary on the website about victims' bodies and alleged promiscuity, resulting in vicious harassment of the individuals depicted.

16. Thirty-eight states, including Nevada, and the District of Columbia, have passed laws making the dissemination of intimate images illegal in certain circumstances.  Additionally, a federal statute criminalizes the use of an interactive computer service to intentionally harass or intimidate a person through "engag[ing] in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person."  18 U.S.C. § 2261A(2).

## DEFENDANTS' BUSINESS ACTIVITIES

17. From August 21, 2008 through July 7, 2016, Defendants Applegate and Infante operated EMP.

18. In approximately November 2011, EMP began operating the website MyEx.com.

19. As detailed below, MyEx.com is a website that encourages individuals to submit images of other individuals for posting online.  These images are typically of an intimate nature, exposing genitals, pubic area, buttocks, or female nipples or otherwise depicting sexual conduct ("intimate images").  MyEx.com also solicits personal information about the individuals pictured in the images, and posts that information together with the intimate images, without consent from the victim whose image was posted.

20. Defendant Applegate registered the domain MyEx.com through domain name registrar GoDaddy from November 2011 through at least June 2013.  He provided GoDaddy the email address shad@myex.com as his contact address.

21. In May of 2013, GoDaddy informed Defendant Applegate of reports of child exploitation and underage content on MyEx.com.  GoDaddy also informed Defendant Applegate that an

investigator from an internet-crimes-against-children taskforce and a police detective were attempting to get in touch with the website operators.

22. Also in May 2013, Defendant Applegate changed the contact name provided to GoDaddy for the MyEx.com website to "Eun Kim" and changed the contact address to Singel 540, 1017 AZ Amsterdam, Netherlands, while leaving the contact email address as shad@myex.com for a period of time. After GoDaddy inquired about this change, Defendant Applegate told GoDaddy in a message, "its [*sic*] not a company it's a made up name for the address &amp [*sic*]; phone number in the Netherlands. The [expletive] domain is in my godaddy [*sic*] account." Defendant Applegate then moved MyEx.com to a different registrar, Eurodns. He provided Eurodns the contact name "Eun Kim" and changed MyEx.com to be associated with the fictional business entity, Web Solutions B.V. He provided a contact address of Singel 540, 1017 AZ Amsterdam, Netherlands, which was the same address he told GoDaddy that he made up.

23. In July 2016, Defendant Applegate notified Defendant Infante—at that time, the president, secretary, and treasurer of EMP—that EMP was to be dissolved. Defendant Infante's name was forged on the dissolution papers that were filed in Nevada.

24. Defendant Applegate and Unknown Parties continue to operate and control MyEx.com behind an anonymized registration. MyEx.com's domain name registrar as of July 2017 is Pananames, which is based in Panama. The registrant organization for MyEx.com, as of July 2017, is Global Domain Privacy Services, Inc., a registration proxy service that is also based in Panama. The domain name was registered by the company Yeicox Limited, which was incorporated in the British Virgin Islands. Yeicox Limited lists its address and contact

information as being Quijano Chambers, P.O. Box 3159, Road Town, Tortola, British Virgin Islands.

**Defendants Encourage and Solicit Intimate Images and
Personal Information to Post on Website Without Consent**

25. Defendants encourage and solicit individuals to submit intimate images, including photos, videos, documents, and audio files, of other individuals, often ex-partners, whose intimate parts are exposed or who are engaged in sexual conduct for public posting on the MyEx.com website.

26. Defendants have specifically encouraged and solicited the posting of intimate images and personal information without the pictured individual's consent. The website makes clear that the purpose of such posting is to harm the pictured individual. Defendants have advertised the website as "MyEx GET REVENGE!" and "Naked Pics of Your Ex." The MyEx.com site has invited individuals to "Add Your Ex," "Submit Pics and Stories of Your Ex," "Search for your Ex," or "Find Someone You Know." In past versions of the site, when one clicked on "Make a Post" the site stated, "Add Someone. Feel Good." The site also described itself as a site where one could "Get the dirt before you get hurt or submit your ex gf and bf and get revenge!" The MyEx.com website name itself indicates that the site is aimed at ex-partners.

27. Defendants receive and compile the intimate images and personal information, and post the images together with other content, such as votes in the form of star ratings, as well as view counts, for each individual's publicly available entry on the MyEx.com website, as described further below.

28. Defendants were aware that many of the consumers whose intimate images and personal information they posted on the website did not consent to postings. Many consumers

informed Defendants through emails that the website contained intimate images alongside personal information without the consent of the individuals in the images.

29. Moreover, Defendant Applegate was specifically informed that certain of the images on the site could not be consented to, as they were images of individuals under the age of consent.

### Publicly Available Intimate Images and Personal Information on Previous Versions of Website

30. In previous versions of MyEx.com, Defendants specifically solicited information about the individual in the solicited image(s), including: nickname; gender; full date of birth; maiden name; personal email address; city, state and country of residence; city, state, and country of birth; phone number; and URL links to social network profiles on Facebook, Twitter, LinkedIn, and Myspace. Defendants further solicited a title for the post and a narrative about the images or the individual pictured (referred to as "The Dirty Details"), and provided a selection of categorical tags that the submitter could choose to appear with each post, including "Bad In Bed," "Broke," "Cheater," "Dead Beat Dad," "Dead Beat Mom," "Drug Addict," "Ex Con," "Gay," "Gold Digger," "Good in Bed," "Has Jungle Fever," "Liar," "Physically Abusive," "Slut," "Sweetheart," and "Teeni Weeni."

31. The publicly available landing page of MyEx.com included intimate images of individuals that were located directly next to personal information about the person in the images, which at various times included: first name; last name; city and state; full date of birth; links to email and social media accounts, including Twitter, LinkedIn, Myspace, and Facebook; categorical tags; and the submitter's narrative description of the individual pictured.

32. When a visitor to the site clicked on an entry, they would be brought to the MyEx.com page featuring the full entry, which was also publicly available. The full entry may have contained additional personal information about the person pictured in the image, and more

images, documents, and audio or video files.  The full-entry page also has included the running total number of views of the full entry, an ability to vote on a star rating for the entry, and in some cases a "MyEx ID Number."

33. Defendants provided a site-specific search function that enabled MyEx.com visitors to search for images by first name, last name, middle name, maiden name, nickname, date of birth, gender, and both present city, state, and country as well as city, state, and country of birth.  Defendants encouraged visitors to use its search function with the line "Find Someone You Know."

34. From at least August 2012 through January 2013, MyEx.com's Terms of Use and Privacy Policy stated the site was provided by "EMP Media, Inc."

**Publicly Available Intimate Images and Personal Information on Current Website**

35. Defendants currently solicit from submitters personal information about the individual in the intimate images, including first name, middle name, and last name of the individual whose intimate image is posted, alongside age and location.

36. When a visitor to the site clicks on an entry the visitor will be brought to the MyEx.com page featuring the full entry, also publicly available, which may contain—in the narrative description for the entry—more personal information about the individual pictured, more images, and video files.  The full-entry page also provides the running total number of views of the full entry, an ability to vote for a star rating for the entry, the total number of votes cast on an entry, and the overall star rating of an entry.  The site has categories one can click on, such as "Just Girls," "Just Guys" and "Sex Tapes."  The site also curates a subset of entries on its landing page, directing the visitor to sections titled "Recently Most Viewed Exs," "Most Viewed Exs," and "Most Rated Exs."  As these activities demonstrate,

Defendants develop and create the manner in which consumers' intimate images and personal information are displayed on the public website they control and operate.

37. The entry pages also contain a comment field for users to write comments about the subject of the images, which are also then publicly available.  As of July 2017, any visitor to the website can post comments about the images.  Such comments often include derogatory and sexually explicit language directed at the subject of the image.  In some cases, a man named "Casey," who purportedly runs the site, leaves comments on the entries.

38. Based on the number of webpages on the site and the number of entries provided on each webpage, the website contains approximately 12,620 entries as of December 2017.

39. Visitors to the site can search for entries on the site itself by first name, last name, and location, and can filter the search for "images only" and "videos only."  The images and personal information made available on MyEx.com are indexed by generally available search engines.  Individuals whose images are posted on the site report that those images appeared prominently in search results for their names.

40. Many consumers learned that intimate images of them were posted on MyEx.com, along with their personal information, when they were contacted by strangers via text message, email, or social media, frequently through links to their personal profiles posted on MyEx.com.

41. While visitors to MyEx.com may create a free account to login to the site by enrolling with an email address and creating a username and password, a visitor to the website does not need to create an account to see the content on the site, including the full entries, or to leave a comment on the site.

**Defendants Charged Fees for Removal of Intimate Images and Personal Information**

42. For certain periods of time, under its "Removal Policy," the site stated, "Myex.com does not permit or entertain removal requests from individuals who have been submitted to this website."  The Removal Policy has also stated that, "As a general rule, if you don't want photos of you end [*sic*] up on the internet be more careful who you send them too [*sic*] or better yet don't send them at all."

43. Under the "Contact Us" page, the site stated, "Myex.com has no removals [*sic*] policy.  If you are an adult who has been submitted to this site tough luck [*sic*]."  The page went on to state, "If you have the need to send mail please address it to MyEx.com c/o Web Solutions B.V. Attn Legal Department DMCA Complaints. Websolutions Netherlands, Singel 540 1017 Amsterdam The Netherlands Attn: Legal Department."

44. However, in parts of 2013 and 2014, its Removal Policy stated, "Myex.com may adhere to the dispute resolution process from independent arbitration services.  If you feel you have been submitted to this site wrongfully you may contact one of the independent arbitration services below."  At times, the site did not list any arbitration services.  At other times, the site listed various arbitration services, such as reputationguard.co, or otherwise communicated to consumers through links or emails, the availability of arbitration services such as internetreputation.com.

45. Through these services or otherwise, Defendants demanded payments of $499 up to $2,800 from consumers for removal of intimate images and personal information posted on the website.  Some of these charges were annual recurring fees to keep the intimate images and personal information off the website and may be ongoing.

46. Certain consumers who contacted the website to request removal of materials report the following:

    a.  "The website is asking for $499 to remove the pictures but when I informed them that I had contacted the police they didn't reply back to my email. It seems to be a scam because they ask for you to pay the $499 in money order from western union for an account in the name of Sheila Mae R. Garcia 5021nZamora St. Lourdes Northwest, Angeles City - 2009 Phillipines [*sic*] mobile number [redacted phone number] when the website provides you with a Netherlands address. Websolutions Netherlands Singel 540 1017 AZ Amsterdam The Netherlands."

    b.  "I was really shocked to see myself on there [MyEx.com]! This info is not true and I want to remove my pics and info off that site but when I click on remove info it leads me to a page saying I need to pay money which looks like it's in Euro currency.  If I try to contact the website it says that I need to write snail mail to them in Amsterdam but I also emailed them somehow and in that email it says they will remove my info if I give them $499.99 through Western Union in the Phillippines [*sic*].  This is all very confusing because there are several ways to pay and in different currencies and different destinations.  This seems like extortioin [*sic*] to me and I believe the owners of the website www.myex.com also owns the repuation [*sic*] guard website as well."

    c.  "According to the website, in order to remove myself from the website I have to pay $499.99 to ReputationGuard.co via Western Union to Sheila Mae Garcia. The address listed for her is 5021 Zamora St. Angeles City, Philippines, zip code 2009. The phone number listed for her is [redacted phone number]. Once the money would be wired, I would then have to email ReputationGuard.co at support@reputationguard.co with the tracking number, my name, my city and state and country, and the profile name that was to be removed from www.myex.com."

    d.  "[MyEx.com] posted pictures of my daughter when she was a minor and posted a picture of a naked woman with her face photoshopped onto picture. [] My daughter has been contacted to extort 500.00 to remove the fake pic of her from their site. see email below.  ---------- Forwarded message ---------- From: ¿<support@reputationguard.co>¿ Date: Fri, Jan 3, 2014 at 6:34 PM Subject: Re: Picture To: [redacted name] <[redacted email address]>  It's a 499.99 fee instructions are below to send via western union > My name is on the website with a naked picture that is not of me and pics of me are underage. How do I > get this off of the "myex.com" website? >  -- Pay via Western Union WESTERN UNION INSTRUCTIONS: Amount: 499.99 USD Send to: Sheila Garcia 1950 Kuliat St. Lourdes Sur Angeles City, Philippines Zip code 2009 Phone: [redacted phone number] Please email us after you have wired the money with the tracking number, senders name,city,state [*sic*] & Country the money

13

was sent from. Also include the profile name to be removed.  Please send an email to this address support@reputationguard.co for the detail instructions. Please allow up to 24 to 72 hours for your record to be deleted when using Western Union.  Please email us after you have wired the money with the tracking number, senders name,city,state [*sic*] & Country the money was sent from. Also include the profile name to be removed.”

e.   “[O]n January 5th i got sent text message stating there was nude unauthorized photos of me on www.myex.com i went to the website put link in and saw these photos. they linked my facebook to this site so i had unsolicited friend request and comments and still receiving messages. when asked if i wanted to remove these photos they sent me to a third party site (http://reputationguard.co/payment/?site=myex&id=11496) asking that i pay a western union in the sum of $499 to this address  Send to: Sheila Garcia 1950 Kuliat St. Lourdes Sur Angeles City, Philippines Zip code 2009 Phone: [redacted phone number] [.]”

f.   “Someone posted pictures of my wife on myex.com December 1st 2013.  The only way to get them removed is to click the ‘remove my name’ link at the top of the page which takes you to another site which offers to remove your name from several other web sites for $499.99 each which is sent via western union to a woman in the Philipines [*sic*].”

g.   “On the myex.com site there is a button that says remove my pictures and a link to a shopping cart that charged $495.00.”

**Consumer Harm**

47. Consumers experienced direct financial harm as a result of Defendants’ charging of fees for removal of intimate images and personal information.

48. Additionally, consumers have lost their jobs—or are concerned that they might be fired from a current job—because their personal information and intimate images are on MyEx.com.  Consumers also fear not being hired for a future job, as the photos are publicly available and would appear in an employer’s online search results for a job applicant’s name on generally available search engines.  Below is a sample of consumer complaints received by the Federal Trade Commission:

14

a. "These pictures can cause me [to lose] my job and school. The website is asking for $499 to remove the pictures but when I informed them that I had contacted the police they didn't reply back to my email. It seems to be a scam because they ask for you to pay the $499 in money order from western union … I need help in taking these pictures down, it's affecting my life in every way. I've had to miss school and work and I've been getting sick from my nerves and distress. please help me"

b. "I was 17 years old when the photos were taken.  My previous place of work, [redacted place of work], also received a phone call detailing the website where my photos were posted. I have gone to the website, my ex.com [*sic*], and these photos were posted. [redacted link to MyEx.com profile].  The users of the website have access to my name, my facebook and my place of work. I am being blackmailed and am concerned for my safety and my future. I WAS a minor in an abusive relationship when these photos were taken, and I do not want them to tarnish my future. I have, as a result, temporarily deleted my facebook account."

c. "The picture now shows up in Google when my name is searched. I am in my last semester in school to become a public school teacher. I begin student teaching in a week. I will be teaching high school. It only takes one student to Google my name before the entire school finds out. My career is in jeopardy…. Please help. I do not want my career to be ruined because of something like this- and I would never want to think any of my students could be victimized the same way."

d. "It may sound like something petty to you but you must understand that [it] is destroying my life and [there's] more to it than you realize.... I was also posted … and in the posting it says [I'm] on steroids, gay and racist, then in comment section it posts my address phone number etc[.] putting me in danger.  After many attempts and emails to the site trying different avenues they do nothing, [won't] take it down etc. I lost my contract with [redacted business] and had to take a low paying [redacted business] job because if I am google searched … [it's] what comes up, [I've] always been an honest citizen and haven't ever been in an ounce of trouble my whole life and [I've] pretty much lost my business because of this site.  Many people have committed suicide due to this site because it is there to destroy lives and maybe some of the people were posted there for good reason but [there's] a lot who have not done nothing to deserve any of this.  It sounds petty but this is a big deal, this destroys lives."

e. "My ex[-]boyfriend put naked pictures of me on myex.com. there are a few pictures a video and my full name and the city where I live also on the internet. Also the other day someone called one of my jobs and told my coworkers there were naked pictures of [me] on the internet."

49. Consumers suffer substantial harm from having their intimate images and personal information posted on the site.  This posting of intimate images and personal information is an unwarranted invasion of privacy into consumers' lives.  In addition, it causes injury in the form of depression, anxiety, loss of reputation, and safety fears.  Many consumers ultimately incur medical expenses, such as the cost of medications or professional mental health care, as a result of Defendants' practices.  Consumers also incur legal expenses, frequently seeking out legal assistance to have their intimate images and personal information removed from the site, and to get relief against harassers.  Consumers also lose time working with local police and authorities concerning these postings of their intimate images and personal information.

    a. "Besides the attempt to defame and extort money, I feared for the safety of myself and my family (my partner and 9 year old son). I stopped sleeping, eating, and began to hide inside my house researching laws and contacting anyone I could think of."

    b. "My 16 year old is the latest victim of this extortion site.  She had made the unfortunate mistake of sending her boyfriend some topless photos. With the intent that they were for 'his eyes only' since he was her 'boyfriend[.]'  After they broke up, he posted these pictures and derogatory remarks about her on the site, including her real name, city, person info and psychiatric information."

    c. "I am trying to have my friends photos removed from the website: www.myex.com[.] It is damaging to her job and mental well-being… If we cannot get in contact with the company and have her photos and information deleted expeditiously we will have to hire an attorney and file a lawsuit for invasion of privacy, intentional infliction of emotional distress, or copyright infringement. Every minute this is not dealt with impacts her job and [mental] well-being."

    d. "There are comments under the pictures that confirm that people are recognizing me in the photos. I am upset and I'm scared. I fear for my safety. I feel like a computer hacker is somehow tracking and targeting me. It's really messing with my head, not to mention how worried and upset my husband is by this situation as he has had to listen to me deal with this while he is also dealing with being overseas on deployment. My husband and I are good people... We don't deserve

16

this abuse. We believe we are the victims of computer hacking and internet abuse. Please help me."

e. "…If you search my name on google the images pop up and then [link] you to the website. This has ruined my life my friend was googling names and saw the images ... There are very bad comment[s] on the pictures and false statements made. This has humiliated me [and] defamed my name. This is a hate crime and I want justice. [I] did not give any form of permission for these pictures to be posted. I am very mentally disturbed by this and need immediate assistance…"

f. "The grief that I'm experiencing is indescribable!  I have a 13-year-old daughter, one parent with severe dementia and another who will literally have a heart attack if he finds these photos!  I am afraid to apply for a job anywhere as most places do background checks and this site is now directly associated with my name as it comes up immediately!  I am under a doctor's care for depression and anxiety due to this nightmare."

50. Some consumers receive unwelcome contact from strangers, including lewd and threatening phone calls, as well as harassing messages and emails due to the public linking of personal information and social media accounts by MyEx.com, including to personal Twitter and Facebook accounts:

a. "I have been harassed since this was posted.  I want this site removed. My reputation has been tarnished, these pictures have been sent to everyone I know. It is humiliating. The slanderous site was linked up to my facebook, which causes more harassment. I had to delete it."

b. "I received a Facebook message from a stranger, informing me that my picture and name is on this website…"

c. "The slanderous site was linked up to my facebook, which causes more harassment. I had to delete it."

d. "There was nasty comments left by users of the website, and there was also a direct link to my Facebook profile. Because of the Facebook link, I have been getting harassing messages from guys who frequent that website and saw me."

**MyEx.com Revenues**

51. Defendants have taken in revenue by charging consumers fees to have images of them taken down from the site, either directly or through the purportedly "independent" reputation management services.  Defendants also have sold advertising on the website, including full site takeover ads, header banners, sidebar banners, post banners, leaderboards, and sidebar sponsor link lists.

52. From January 2014 through April 2016 alone, EMP took in more than $4 million.

## <u>VIOLATIONS OF THE FTC ACT</u>

53. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

54. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

**(By Plaintiff Federal Trade Commission)**

55. As described in paragraphs 13 through 54, Defendants solicit intimate images and personal information from ex-partners of individuals depicted in the images, and disclose, without the consent of the individuals depicted, these intimate images and personal information on a website that enables the public to identify or contact the individuals depicted.

56. Defendants' acts and practices have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition.

57. Therefore, Defendants' practices as described in Paragraph 55 above constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

### COUNT II

### (By Plaintiff Federal Trade Commission)

58. In numerous instances, Defendants have charged or have caused others to charge consumers fees of $499 or more to remove intimate images and personal information from a public website, which Defendants solicited and disclosed without the consent of the individual depicted, in a way that enabled the public to identify or contact the individuals in the intimate images.

59. Defendants' acts or practices have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition.

60. Therefore, Defendants' practices as described in Paragraph 58 above constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATION OF THE STATE OF NEVADA'S DECEPTIVE TRADE PROVISIONS

### Count III

### (By Plaintiff State of Nevada)

### (Violation of Section 598.0923(4) of the Nevada Revised Statutes)

61. Nevada Revised Statute § 598.0923(4) states that it is a deceptive trade practice when, in the course of his or her business or occupation, a person knowingly uses coercion, duress or intimidation in a transaction.

62. Defendants knowingly used coercion, duress or intimidation in a transaction when, as described in Paragraphs 13 through 52 above, they sought payment from consumers to take down the personal information and intimate images of consumers they had posted on their publicly available website.

63. Therefore, each of the Defendants' act or practices that used coercion, duress or intimidation in a transaction is a violation of Chapter 598 of the Nevada Revised Statutes, NRS § 598.0923(4).

## CONSUMER INJURY

64. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

65. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations  of

any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

66. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff, the State of Nevada, to enforce its state law claims under the Deceptive Trade provisions of the Nevada Revised Statutes, Chapter 598, against Defendants in this Court.  Section 598.0963(3) of the Nevada Revised Statutes, NRS § 598.0963(3), empowers this Court to grant injunctive and other equitable relief to prevent and remedy violations of that Act. Pursuant to Nevada Revised Statutes § 598.0999(2), if this Court finds that any person has willfully engaged in a deceptive trade practice, the Attorney General may recover a civil penalty not to exceed $5,000 for each violation and, in addition to any other relief or reimbursement, the Court may award reasonable attorney's fees and costs.

## **PRAYER FOR RELIEF**

67. Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. §§ 53(b), and Plaintiff State of Nevada, pursuant to Chapter 598 of the Nevada Revised Statutes, and the Court's own equitable powers, request that the Court:

A.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, expedited discovery, suspension of the website, and orders freezing assets;

B.  Enter a permanent injunction to prevent future violations of the FTC Act and

Chapter 598 of the Nevada Revised Statutes by Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act, including but not limited to,

rescission or reformation of contracts, restitution, the refund of monies paid, and the

disgorgement of ill-gotten monies;

D.  Award Plaintiff State of Nevada attorneys' fees; and

E.  Award Plaintiffs the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.


Respectfully submitted this 9ᵗʰ day of January, 2018.

                              DAVID C. SHONKA
                              Acting General Counsel

                               /s/  Megan Cox
                              MEGAN COX
                              ALLISON M. LEFRAK
                              Attorneys
                              Federal Trade Commission
                              600 Pennsylvania Avenue NW
                              Mailstop CC-8256
                              Washington, DC 20580
                              Telephone: 202-326-2282 (Cox)
                              Telephone: 202-326-2804 (Lefrak)
                              Facsimile: 202-326-3392
                              Email: mcox1@ftc.gov, alefrak@ftc.gov,

                              Attorneys for Plaintiff
                              FEDERAL TRADE COMMISSION


                               /s/  John R. McGlamery
                              JOHN R. MCGLAMERY
                              LAURA TUCKER

Deputy Attorneys General, Bureau of Consumer Protection
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Phone (775) 684-1169
Facsimile: (775) 684-1170
Email: JMcGlamery@ag.nv.gov,
LMTucker@ag.nv.gov

Attorneys for Plaintiff
ATTORNEYS FOR STATE OF NEVADA