ALDEN F. ABBOTT
General Counsel

MEGAN COX
mcox1@ftc.gov
ALLISON M. LEFRAK
alefrak@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue NW
Mailstop CC-8256
Washington, DC 20580
202-326-2282 (Cox)
202-326-2804 (Lefrak)
202-326-3395 (Fax)
*Attorneys for Plaintiff Federal Trade Commission*

ADAM PAUL LAXALT
Attorney General
LAURA TUCKER
Senior Deputy Attorney General, Bureau of Consumer Protection
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Phone (775) 684-1244
Facsimile: (775) 684-1170
Email: LMTucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | Case No. 2:18-cv-00035 |
| and | ) | |
| STATE OF NEVADA, | ) | **PLAINTIFFS' MOTION FOR AND MEMORANDUM IN SUPPORT OF ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS** |
| Plaintiffs, | ) | |
| v. | ) | |
| EMP MEDIA, INC., *et al.*, | ) | |
| Defendants. | ) | |

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Best Western Int'l v. Universal Hospitality, Inc.*, No. CV-08-91-PHX-DCG, 2008 U.S. Dist. WL 2003784 (D. Ariz. May 8, 2008) ............................................................ 11, 12, 16, 17

*Bland v. Fessler*, 88 F.3d 729 (9th Cir. 1996) ...................................................... 20

*Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319 (7th Cir. 1983) .. 22

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986) ................................................ 11, 12

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) .................................... 12

*Florida Physician's Ins. Co., Inc. v. Ehlers*, 8 F.3d 780 (11th Cir. 1993) ...................... 21

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ............................................ 19

*FTC v. Evans Prod. Co.*, 775 F.2d 1084 (9th Cir. 1985) ......................................... 18

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ...................................................... 21

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) .......................................... 21

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ....................................... 18

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................................ 18

*FTC v. Mandel Bros., Inc.*, 359 U.S. 385 (1959) ................................................ 19

*FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) .................................... 18

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) .......................................... 18

*FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ........................ 21

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) .................................. 18

*Geddes v. United Fin. Group*, 559 F.2d 557 (9th Cir. 1977) ............................. 10, 12, 17

*Gresham v. Picker*, 214 F. Supp. 3d 922 (E.D. Cal. 2016) ...................................... 20

*In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949 (1984) .................................... 13

*Leedo Cabinetry v. James Sales & Distrib., Inc.*, 157 F.3d 410 (5th Cir. 1998) .................. 22

*Nev. Prop. 1 LLC v. NewCosmopolitanLasVegas.com*, No. 2:12-CV-866 JCM NJK, 2013 WL 167755 (D. Nev. Jan. 15, 2013) ............................................................ 12

*Patriotic Veterans, Inc. v. Hill*, 137 S. Ct. 2321 (2017) ................................................ 20

*Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303 (7th Cir. 2017)................................ 20

*PepsiCo, Inc. v. Cal. Sec. Cans*, 283 F.Supp.2d 1172 (C.D. Cal. 2002) ................. 12, 17

*Pope v. United States*, 323 U.S. 1 (1944) ..................................................................... 10

*Sears, Roebuck and Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) .................................. 19

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ............................................................. 19

*Speiser, Krause & Madole P.C. v. Ortiz*, 271 F.3d 884 (9th Cir. 2001)................. 10, 11

*Sterling Drug, Inc. v. FTC*, 741 F.2d 1146 (9th Cir. 1984) ........................................ 19

*TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) .............................. 10

*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212 (9th Cir. 1979) ........................... 19

**Statutes**

15 U.S.C. § 45(a) ......................................................................................................... 3, 13

15 U.S.C. § 45(n) ............................................................................................................. 13

15 U.S.C. § 53(b) ............................................................................................................. 18

Chapter 598 of the Nevada Revised Statutes ............................................................. 3, 16

Nevada Revised Statute § 598.0923(4)............................................................. 13, 15, 16, 17

Section 13(b) of the Federal Trade Commission Act ..................................................... 18

Section 5 of the Federal Trade Commission Act ................................................... 3, 13, 15

**Rules**

Federal Rules of Civil Procedure 12(a)(1)(A) ................................................................. 9

Federal Rules of Civil Procedure 12(a)(1)(A)(i) ........................................................ 3, 12

Federal Rules of Civil Procedure 12(a)(1)(A)(ii) ....................................................... 4, 12

Federal Rules of Civil Procedure 55(a) ....................................................................... 4, 10

Federal Rules of Civil Procedure 55(b) ..................................................................... 10, 17

Federal Rules of Civil Procedure 55(b)(2)............................................................. 3, 11, 21

Pursuant to Fed. R. Civ. P. 55(b)(2), and this Court's local rules, Plaintiffs the Federal Trade Commission ("FTC" or "Commission") and the State of Nevada hereby move for the entry of judgment by default against Defendant EMP Media, Inc. ("EMP") and Defendant Shad Applegate, also known as Shad Cottelli ("Cottelli"). These two Defendants ("Defendants"), despite having been served with their respective summons and the complaint, have failed to appear, answer, or otherwise respond to the complaint.[1]  Plaintiffs therefore request that the Court enter the proposed Default Judgment and Order for Permanent Injunction and Other Equitable Relief ("Default Judgment" or "proposed order"), including injunctive relief and an equitable monetary judgment of $2,022,930 against the Defendants.

# I.   PROCEDURAL HISTORY

On January 9, 2018, Plaintiffs filed a complaint in this Court for injunctive and other equitable relief against three defendants for engaging in acts and practices that violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a) and Chapter 598 of the Nevada Revised Statutes (the "Complaint").  ECF No. 1.

On January 10, 2018, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to Defendant Aniello Infante.  ECF No. 9.  On January 12, 2018, Defendant EMP was served the summons and complaint through its registered agent, Aniello Infante.  ECF No. 20.  A Proof of Service was executed and subsequently filed with the Court attesting that Defendant EMP was properly served.  *Id.*  Under Fed. R. Civ. P. 12(a)(1)(A)(i), Defendant EMP had until February 2, 2018 to answer or otherwise respond to the Complaint, and it failed to do so.

On January 26, 2018, Plaintiffs filed a motion for authorization to use alternative service of process on Defendant Cottelli.  ECF No. 12.  The Court entered an order granting the motion on February 1, 2018.  ECF No. 16.  On February 2, 2018, Defendant Cottelli was served the

---

[1] To date, no counsel has entered an appearance in this action on behalf of Defendant EMP or Defendant Cottelli.

summons and complaint through the alternative service of process ordered by the Court.  ECF No. 21.  A Certificate of Service and declaration was executed and subsequently filed with the Court attesting that Defendant Cottelli was properly served.  Under Fed. R. Civ. P. 12(a)(1)(A)(ii), Defendant Cottelli had until May 3, 2018 to answer or otherwise respond to the Complaint, and he failed to do so.

Accordingly, on May 10, 2018, Plaintiffs moved for entry of the Clerk's default against Defendants EMP and Cottelli, and served a copy of its motion on EMP's registered agent via Federal Express, and Cottelli by email.  ECF No. 22.  On May 11, 2018, the Clerk of Court entered defaults against Defendants EMP and Cottelli pursuant to Fed. R. Civ. P. 55(a).  ECF No. 23.  To date, these defendants have not asked the Court to set aside the entry of default.

## II.      DEFENDANTS' BUSINESS PRACTICES

As set forth in the Complaint, Defendants operated a website called MyEx.com ("MyEx") dedicated solely to "revenge porn," or nonconsensual pornography, from November 2011 through January 2018.  Defendants solicited intimate pictures and videos for the website together with personal information of the victims, including full name, age, address, employer, phone number, social media account information, and email address, without the victims' consent.  The site also extorted victims by requiring them to pay fees of hundreds of dollars to have their intimate pictures, videos, and information removed from the public site.

### A.  The Website MyEx.com

MyEx.com encouraged and solicited individuals to submit intimate images, including photos, videos, documents, and audio files, of other individuals, often ex-partners, whose intimate parts are exposed or who are engaged in sexual conduct for public posting on MyEx.com.  Exhibit 1 at 6, 16, 17-18, 26 (Cheryl Thomas Declaration at ¶¶ 12-13, 57, 61, 92; Attach. A, page 3; Attach. H; Attach. HH).  These images were typically of an intimate nature, exposing genitals, pubic areas, buttocks, or female nipples or otherwise depicting sexual conduct. Exh. 1 at 17-18, 24 (Thomas Decl. at ¶¶ 61, 83; *see e.g.* Attach. H; Attach. S; Attach. Z; Attach CC; Attach EE).

The website made clear that the purpose of such posting was to harm the pictured individual. It was advertised as "MyEx GET REVENGE!" and a place to publicly post "Naked Pics of Your Ex." Exh. 1 at 15-16, 26 (Thomas Decl. at ¶¶ 55, 92; Attach. E; Attach. HH). The MyEx.com site invited individuals to "ADD YOUR EX," "Submit Pics and Stories of Your Ex," "Search for your Ex," or "Find Someone You Know." Exh. 1 at 15-18, 19-20 (Thomas Decl. at ¶¶ 55, 58, 59, 61, 67, 68; Attach. E; Attach. F; Attach. H; Attach. N; Attach. O). When one clicked on "Make a Post" the site stated, "Add Someone. Feel Good." Exh. 1 at 19 (Thomas Decl. at ¶ 67; Attach. N). The site also described itself as a site where one could "Get the dirt before you get hurt or submit your ex gf and bf and get revenge!" Exh. 1 at 6, 26 (Thomas Decl. at ¶ 13, 92; Attach. A, page 3; Attach. HH). The MyEx.com website name itself indicates that the site is aimed at ex-partners. Exh. 1 at 6, 26 (Thomas Decl. at ¶¶ 13, 92; Attach. A, page 3; Attach. HH).

Defendants specifically solicited information about the individual in the solicited image(s), including: name, nickname; gender; full date of birth; maiden name; personal email address; city, state and country of residence; city, state, and country of birth; phone number; and URL links to social network profiles on Facebook, Twitter, LinkedIn, and MySpace. Exh. 1 at 15-18 (Thomas Decl. at ¶¶ 55, 56, 58, 61; Attach. E; Attach. H). Defendants further solicited a title for the post and a narrative about the images or the individual pictured (referred to as "The Dirty Details"), and provided a selection of categorical tags that the submitter could choose to appear with each post, including "Bad In Bed," "Broke," "Cheater," "Dead Beat Dad," "Dead Beat Mom," "Drug Addict," "Ex Con," "Gay," "Gold Digger," "Good in Bed," "Has Jungle Fever," "Liar," "Physically Abusive," "Slut," "Sweetheart," and "Teeni Weeni." Exh. 1 at 15-16 (Thomas Decl. at ¶ 55; Attach. E). At one time, the site inquired "Does your EX have kids?" Exh. 1 at 18-19 (Thomas Decl. at ¶ 65; Attach. L). The site also stated, "[f]ace must be visible in at least one picture. If photo is nude check the box." Exh. 1 at 19 (Thomas Decl. at ¶ 67; Attach. N). Defendants received and compiled these intimate images and personal information, and posted the images together with other content they created, such as votes for entries in the

form of star ratings, as well as view counts, for each individual's publicly available entry on MyEx.com.  Exh. 1 at 18, 24 (Thomas Decl. at ¶¶ 64, 82; Attach. K, CC).

The publicly available landing page of MyEx.com included intimate images of individuals that were located directly next to personal information about the person in the images, which at various times included: first name; last name; city and state; full date of birth; links to email and social media accounts, including Twitter, LinkedIn, Myspace, and Facebook; categorical tags; and the submitter's narrative description of the individual pictured.  Exh. 1 at 17-18 (Thomas Decl. at ¶ 61; Attach. H).  When a visitor to the site clicked on an entry, he or she would be brought to the MyEx.com page featuring the full entry, which was also publicly available.  Exh. 1 at 18 (Thomas Decl. at ¶ 62).  The full entry typically contained additional personal information about the person pictured in the image, and more images, documents, and audio or video files.  The full-entry page also has, at various times, included the running total number of views of the full entry, an ability to vote on a star rating for the entry, and in some cases a "MyEx ID Number."  Exh. 1 at 18, 24 (Thomas Decl. at ¶¶ 63-64, 82; Attach. I; Attach. J; Attach. K; Attach. CC).  Defendants provided a site-specific search function that enabled MyEx.com visitors to search for images by first name, last name, middle name, maiden name, nickname, date of birth, gender, and both present city, state, and country as well as city, state, and country of birth.  Exh. 1 at 19-21 (Thomas Decl. at ¶¶ 68-72; Attach. P; Attach. Q; Attach. R; Attach. S; Attach. T; Attach. U).  Defendants encouraged visitors to use its search function with the line "Find Someone You Know."  Exh. 1 at 19-20 (Thomas Decl. at ¶ 68; Attach. O).

Defendants were aware that many of the consumers whose intimate images and personal information they posted on the website did not consent to posting of that material.  Many consumers informed Defendants through emails that intimate images of them, along with personal information about them was posted on the website without their consent.  Exh. 1 at 45-46 (Thomas Decl. at ¶ 124; 119 (i), (j)).  *See e.g.* Exh 2 at 1 (████████ Decl. at ¶ 4).  Moreover, Defendant Cottelli was informed that certain of the images on the site could not be consented to, as they were images of individuals under the age of consent.  Exh. 1 at 11, 12-13

(Thomas Decl. at ¶¶ 41, 46; Attach. B at pages 14 (GD 000077), 15 (GD 000079)).

**B.  Takedown Fees and Removal Policies of MyEx.com**

Defendants charged or caused others to charge consumers fees to remove the intimate images and personal information from the public website.  The site stated that it "may adhere to the dispute resolution process from independent arbitration services.  If you feel you have been submitted to this site wrongfully you may contact one of the independent arbitration companies below [.]"  Exh. 1 at 22-23 (Thomas Decl. at ¶¶ 74, 75, 76; Attach. W; Attach. X; Attach. Y). This was MyEx.com's policy from at least October 2013 through at least March 2014, at which time there were approximately 5,070 consumers featured on the site.  Exh. 1 at 22-23 (Thomas Decl. at ¶¶ 74, 76, 77; Attach. W; Attach. Y; Attach. Z).  Consumers who contacted the website to ask for takedowns of images and information were instructed to wire hundreds of dollars abroad.  Exh. 1 at 32, 33, 34-36, 38, 41-44,   (Thomas Decl. at ¶¶ 117(a), 117(d), 117(f), 117(g), 117(k)), 118(a), 118(b), 118(c), 118(d), 118(e), 118(f); Attach. UU); Exh. 4 at 2 (████ Decl. at ¶ 8).  Most consumers reported the fee as being $499, and others were charged $399. Exh. 1 at 32, 38-39, 41-44 (Thomas Decl. at ¶¶ 117(a), 117(k), 118(a), 118(b), 118(c), 118(d), 118(e)), 118(f); Attach. UU); Exh. 9 at 2 (████ Decl. at ¶ 10); Exh. 4 at 2 (████ Decl. at ¶ 8).  At some point in 2014, the site changed its removal policy, ceased to solicit takedown fees directly from consumers on the website, and stated, "As a general rule, if you don't want photos of you end [*sic*] up on the internet be more careful who you send them too [*sic*] or better yet don't send them at all."  Exh. 1 at 23 (Thomas Decl. at ¶ 78; Attach. AA).

**C.  Additional Revenues Related to MyEx.com**

In addition to the revenues generated by the takedown fees paid by consumers, MyEx.com generated revenues through advertising on the website.  The site worked with individuals or companies interested in advertising when reached directly through contact information on the website.  Exh. 1 at 29-30 (Thomas Decl. at ¶¶ 108-111; Attach. PP; Attach. QQ; Attach. RR).  Most recently, advertising served on MyEx.com came through the advertising network Traffichaus.  Exh. 1 at 30 (Thomas Decl. at ¶ 115; Attach. TT).  From May 2015

through May 2017, MyEx.com generated over $117,000 in advertising profits for Defendants through the Traffichaus ads.  Exh. 1 at 30 (Thomas Decl. at ¶¶ 112-115; Attach. SS).

EMP had bank accounts at different financial institutions while MyEx.com was in operation.  During the time period December 2011 to December 2012, EMP had an account with JPMorgan Chase.  Exh. 5 at 2 (Thomas Van Wazer Declaration at ¶ 3).  At various times between January 2014 to April 2016, EMP had four different accounts with Bank of America— one in its name and three "doing business as" accounts in the names of Internet Secrets, Post My Ad, and T&A Media.  Exh. 5 at 2 (Van Wazer Decl. at ¶ 3) (collectively, with the Chase account, the "Accounts").  No information was available for 2013.  Between December 2011 and April 2016 (excluding 2013), a total of $6,600,295 was collectively deposited into the Accounts.  Exh. 5 at 2-3 (Van Wazer Decl. at ¶ 5).  After eliminating inter-account transfers, a total of $5,915,430.51 was deposited into the Accounts.  Exh. 5 at 3 (Van Wazer Decl. at ¶ 6).

### D.  Defendants Control Over the Domain MyEx.com

From August 21, 2008 through July 7, 2016, Defendant Cottelli operated EMP.  Exh. 1 at 26-27 (Thomas Decl. at ¶¶ 94-98; Attach II); Exh. 6 at 11-12 (Infante Investigational Hearing Transcript ("IH Transcript") at 42-43; 45-46).  Defendant Cottelli was EMP's president from October 2012 through March 2013; secretary from October 2012 through March 2014, and April 2014 through July 2015; treasurer from May 2010 through January 2014; and director from October 2012 through March 2014.  Exh. 1 at 27 (Thomas Decl. at ¶ 98; Attach. II).  As an officer, Cottelli formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EMP, as evidenced by his role in incorporating and then dissolving EMP, engaging GoDaddy's services for MyEx.com on behalf of EMP, and opening of bank accounts for EMP.  Exh. 1 at 6, 9-13, 26, 27-28 (Thomas Decl. at ¶¶ 15, 29-50, 94-98, 99-100, Attach. A, page 759; Attach. B; Attach. II; Attach. JJ); Exh. 6 at 11-12 (IH Transcript) at 42-43; 45-46).  In approximately November 2011, EMP began operating MyEx.com.  Exh. 1 at 6, 9 (Thomas Decl. at ¶¶ 15, 29; Attach. A, page 759; Attach. B, page 19).  From at least August 2012 through January 2013, MyEx.com's Terms of Use and Privacy Policy stated the site was

provided by "EMP Media, Inc."  Exh. 1 at 14-15 (Thomas Decl. at ¶¶ 53, 54; Attach. C, Attach. D).  Defendants continued the site's operation in various names and with proxy services, as detailed further below, through January 2018, when Plaintiffs filed the complaint, at which time the site was taken down.  Exh. 1 at 25-26 (Thomas Decl. at ¶¶ 90-91).

Defendant Cottelli registered the domain MyEx.com through the domain name registrar GoDaddy from November 2011 through at least June 2013.  Exh. 1 at 6, 9-13 (Thomas Decl. at ¶¶ 15, 29-50; Attachs. A, page 759; Attach. B pg 1-4, 19, 23).  He provided GoDaddy the email address shad@myex.com as his contact address.  Exh. 1 at 7, 11, 12 (Thomas Decl. at ¶¶ 17, 40, 42; Attach. A, page 753; Attach. B, pages 2, 5-8).  In May of 2013, GoDaddy informed Defendant Cottelli that an investigator from an internet-crimes-against-children taskforce and a police detective were attempting to get in touch with the MyEx.com website operators regarding content on the site related to reports of child exploitation.  Exh. 1 at 11 (Thomas Decl. at ¶ 41; Attach. B, page 14).  GoDaddy also informed Defendant Cottelli of reports of underage content on MyEx.com received from another police department.  Exh. 1 at 12 (Thomas Decl. at ¶ 46; Attach. B, page 15).   Shortly thereafter, Defendant Cottelli moved the website into the names of other individuals and entities.  Exh. 1 at 7, 13 (Thomas Decl. at ¶¶ 19-20, 48; Attach. A, page 735-36, 751; Attach. B, page 1).

In May 2013, Defendant Cottelli changed the contact name provided to GoDaddy for the MyEx.com website to "Eun Kim" and changed the contact address to Singel 540, 1017 AZ Amsterdam, Netherlands, while leaving the contact email address as shad@myex.com for a period of time.  Exh. 1 at 11 (Thomas Decl. at ¶ 40; Attach. B, page 2).  After GoDaddy inquired about this change, Defendant Cottelli told GoDaddy in a message, "its [sic] not a company it's a made up name for the address &amp [sic]; phone number in the Netherlands.  The fucking domain is in my godaddy [sic] account.  I own it…"  Exh. 1 at 10-11 (Thomas Decl. at ¶ 38; Attach. B, page 12).  Defendant Cottelli then moved MyEx.com to a different registrar, EuroDNS S.A.  Exh. 1 at 13 (Thomas Decl. at ¶ 48; Attach. B, page 1 (GD 000003)).  He provided EuroDNS the contact name "[k]im Eun" and provided a fictitious business name, Web

Solutions B.V., as the purported operator of the website.  Exh. 1 at 7, 19, 21-22 (Thomas Decl. at ¶¶ 20, 66, 73; Attach. A, page 736; Attach. M; Attach. V).  He provided a contact address of Singel 540, 1017 AZ Amsterdam, Netherlands, which was the same address that he had given GoDaddy for the entity that he informed GoDaddy that he had made up.  Exh. 1 at 10-12, 19, 21-22 (Thomas Decl. at ¶¶ 38, 40, 42, 66, 73; Attach. B, pages 2, 5-8, 12, (GD000004); Attach. M; Attach. V).

Although the website is currently down, Defendant Cottelli continues to control the MyEx.com URL behind an anonymized registration, as is alleged in the complaint.  MyEx.com's domain name registrar is URL Solutions, Inc. (Pananames) and the registrant organization for MyEx.com, is Global Domain Privacy Services, Inc., a registration proxy service that is based in Panama.  Exh. 1 at 8 (Thomas Decl. at ¶¶ 24-25).

## III.   ARGUMENT

In light of Defendants EMP and Cottelli's failures to answer or otherwise respond to the Complaint filed against them by Plaintiffs and the resulting Entry of Default by the Clerk, this Court should enter a Default Judgment and Permanent Injunction against them.  Fed. R. Civ. P. 55(b); *see also Speiser, Krause & Madole P.C. v. Ortiz*, 271 F.3d 884, 886-87 (9th Cir. 2001) (affirming entry of default judgment based on defendant's failure to timely answer complaint). Once default is entered, the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1, 12 (1944)).

### A.   The Clerk of Court's Entry of Default Was Proper.

Pursuant to Fed. R. Civ. P. 55(a), when it is established "by affidavit or otherwise" that a defendant "has failed to plead or otherwise defend" against the complaint, the clerk of the court shall enter a default against that defendant.  The Summons and Complaint in this action were

properly served on Defendant EMP on January 12, 2018 and Defendant Cottelli on February 2, 2018.  ECF Nos. 20, 21.

Pursuant to Fed. R. Civ. P. 12(a)(1)(A), Defendant EMP's time to answer or otherwise defend against the Complaint expired twenty-one days after the date of service, which was February 2, 2018.  Defendant Cottelli's time to answer or otherwise defend against the Complaint expired 90 days after the date of service, which was May 3, 2018.  The Court's docket sheet confirms that the Defendants have not filed a response to the Complaint.  Moreover, to date, Plaintiffs' counsel has not been served with an Answer or any other responsive motion filed by the Defendants.  Accordingly, the grounds for default are clearly established and the Clerk of Court properly entered a default against the Defendants.

**B.      Entry of Default Judgment is Warranted.**

Under Rule 55(b)(2) of the Federal Rules of Civil Procedure, when default has been entered against a defendant and the plaintiff's claim is not for a "sum certain or a sum that can be made certain by computation," then the Court may enter a default judgment.  *See Best W. Int'l v. Universal Hospitality, Inc.*, No. CV-08-91-PHX-DCG, 2008 U.S. Dist. WL 2003784 at *1-3, (D. Ariz. May 8, 2008) (citing Fed. R. Civ. P. 55(b)(2).  Courts routinely enter default judgments based solely on the well-pleaded allegations in the plaintiff's complaint, which are deemed admitted as a result of the defendant's default.  *See, e.g., Speiser,* 271 F.3d 886-87 (affirming entry of default judgment based on defendant's failure to answer the complaint in a timely manner).  In the Ninth Circuit, courts consider seven factors in determining whether to grant default judgment, and no one factor alone is dispositive.  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  These factors are: (1) the possibility of prejudice to the plaintiff; (2) the merits of the claim; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5)

11

1  the possibility of a dispute concerning material facts; (6) whether default was due to excusable

2  neglect, and (7) the policy favoring a decision on the merits.  *Eitel*, 782 F.2d at 1471-72.  As

3  discussed below, application of the *Eitel* factors to these facts strongly favors granting the

4  Default Judgment and all relief requested by Plaintiffs.

5          **1.      Plaintiffs Will Be Prejudiced if Default Judgment is Not Granted.**

6

7          Plaintiffs will be prejudiced if default judgment is not entered against Defendants because

8  they will be forced to commit time, resources, and personnel to prosecute a lawsuit in which

9  Defendants will not participate.  Despite the requirements under Fed. R. Civ. P. 12(a)(1)(A)(i)

10  and 12(a)(1)(A)(ii) to file answers after being served with a summons and complaint, Defendants

11  have failed to answer or otherwise respond to the Complaint.  To have to continue to litigate

12  against the Defendants when they have shown no interest in defending against the Complaint

13  would prejudice Plaintiffs because without an answer from them, the predicate for testing the

14  Complaint's allegations is lacking.  Thus, the litigation is impeded and no movement toward

15  settling the case against the Defendants is possible.  Moreover, if Plaintiffs' motion for default

16  judgment is not granted, it will likely be without other recourse for recovery.  *Nev. Prop. 1 LLC*

17  *v. NewCosmopolitanLasVegas.com*, No. 2:12-CV-866 JCM NJK, 2013 WL 167755, *1 (D. Nev.

18  2013), citing *PepsiCo, Inc. v. Cal. Security Cans,* 283 F.Supp.2d 1172, 1177 (C.D. Cal. 2002).

19  Such prejudicial effects can be avoided by entry of default.

20

21          **2.      Plaintiffs' Claims Have Been Properly Pled and the Merits of the
                        Substantive Claims Favor Granting Default Judgment.**

22          The second and third *Eitel* factors—merits of the substantive claims and sufficiency of

23  the complaint—also favor default judgment.  "In applying the *Eitel* factors, 'the factual

24  allegations of the complaint, except those relating to the amount of damages, will be taken as

25  true.'"  *See Best W. Int'l*, 2008 U.S. Dist. WL 2003784 at *1 (quoting *Geddes*, 559 F.2d at 560);

26  *see also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (noting that the

27  general rule is that well-pled allegations in the complaint regarding liability are deemed true).

Plaintiffs' Complaint states proper claims against Defendants, alleging that they engaged in unfair acts or practices in violation of Section 5(a) of the FTC Act and the Nevada Revised Statute. ECF No. 1. Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An act or practice is unfair under Section 5(a) if it: (1) causes or is likely to cause substantial injury to consumers; (2) that is not reasonably avoidable by the consumer; and (3) is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n); *see also In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, 1064 (1984). The complaint also alleges a violation of Nevada Revised Statute § 598.0923(4), which states that it is a deceptive trade practice when, in the course of his or her business or occupation, a person knowingly uses coercion, duress or intimidation in a transaction. As described below, the evidence amply demonstrates the merits of the Plaintiffs' substantive claims against Defendants.

### a.        Section 5 of the FTC Act

Plaintiff FTC alleges that Defendants have engaged in unfair acts or practices in violation of Section 5 of the FTC Act. An act of practice is "unfair" under Section 5 if it: (1) causes or is likely to cause substantial injury to consumers; (2) that is not reasonably avoidable by the consumer; and (3) is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n); *see also International Harvester Co.*, 104 F.T.C. 949, 1064 (1984).

The facts alleged in the Complaint sufficiently state valid claims that the practices of Defendants were unfair. This evidence, coupled with the sworn declarations of Commission staff, a victim advocate, and consumer victims submitted in support of this motion demonstrate Defendants engaged in unfair practices.

First, Defendants' unfair practices caused substantial injury. Defendants solicited intimate images and personal information from ex-partners of individuals depicted in the images, and disclosed, without the consent of the individuals depicted, these intimate images and personal information on a website that enables the public to identify or contact the individuals

1    depicted.  In numerous instances, Defendants charged or caused others to charge consumers fees

2    to remove the intimate images and personal information from the public website.  This practice

3    hurt consumers in the form of direct financial loss through paying these fees.  Exh. 4 at 2-3

4    (███████ Decl. at ¶¶ 8, 9, 10); Exh. 3 at 2 (███████ Decl. at ¶ 10); Exh. 7 at 2-3

5    (███████ Decl. at ¶¶ 10-11); Exh. 8 at 7 (Carrie Goldberg Decl. at ¶ 22).  These practices

6    also caused consumer harm in the form of lost employment opportunities and lost educational

7    opportunities stemming from having the intimate images and personal information displayed

8    publicly.  Exh. 3 at 2 (███████ Decl. at ¶¶ 11-12); Exh. 7 at 2-3 (███████ Decl. at ¶¶ 8, 9, 12);

9    Exh. 9 at 2-3 (███████ Decl. at ¶ 11); Exh. 8 at 2-3, 5-6, 8 (Goldberg Decl. at ¶¶ 8, 19, 25-26); Exh.

10   12 at 2 (███████ Decl. at ¶ 9).  Consumers suffered further substantial harm from

11   Defendants' practices of soliciting and disclosing without consent intimate images and personal

12   information on a public website as it was an unwarranted invasion of privacy into consumers'

13   lives.  Exh. 10 at 3-4 (███████ Decl. at ¶¶ 13-19); Exh. 12 at 2 (███████ Decl. at

14   ¶¶ 5, 9); Exh. 9 at 2 (███████ Decl. at ¶¶ 6-8); Exh. 4 at 2-3 (███████ Decl. at ¶¶ 6, 11); Exh. 8 at 5-6,

15   7-8 (Goldberg Decl. at ¶¶ 18, 19, 23-26).  It caused and may continue to cause substantial injury

16   in the form of depression, anxiety, loss of reputation, and safety fears.  Exh. 3 at 2-3 (███████

17   Decl. at ¶¶ 6-9, 12, 13); Exh. 7 at 1-2 (███████ Decl. at ¶¶ 5, 7-8); Exh. 9 at 2-3 (███████ Decl. at ¶¶

18   11, 12, 15); Exh. 4 at 2 (███████ Decl. at ¶ 6); Exh. 12 at 2 (███████ Decl. at ¶¶ 5-7, 9);

19   Exh. 8 at 3, 6-7 (Goldberg Decl. at ¶¶ 9-11, 21).  Many consumers incurred medical expenses,

20   such as the cost of medications or professional mental health care, as a result of Defendants'

21   practices.  Exh. 3 at 2-3 (███████ Decl. at ¶¶ 6-8, 12, 13); Exh. 2 at 2 (███████ Decl. at ¶¶ 8,

22   10); Exh. 9 at 2-3 (███████ Decl. at ¶ 8, 11, 13); Exh. 12 at 2 (███████ Decl. at ¶ 6).

23   Consumers incurred legal expenses when seeking legal assistance to have their intimate images

24   and personal information removed from the site, and to protect themselves from harassers.  Exh.

25   8 at 7 (Goldberg Decl. at ¶¶ 22); Exh. 9 at 2 (███████ Decl. at ¶ 10); Exh. 4 at 2-3 (███████ Decl. at ¶

26   6, 9); Exh. 11 at 1 (███████ Decl. at ¶ 5).  Consumers also lost time working with local

27   police and authorities concerning these postings of their intimate images and personal

information.  Exh. 9 at 2 (████ Decl. at ¶ 9); Exh. 4 at 3 (████ Decl. at ¶ 9); Exh. 7 at 1 (████ Decl. at ¶ 3); Exh. 2 at 1 (████ Decl. at ¶ 4).

Second, these injuries were not reasonably avoidable.  Defendants solicited intimate images and personal information from ex-partners of individuals depicted in the images, and disclosed images and information without the consent of the individuals depicted.  The images solicited and disclosed by the site were often taken in the midst of intimate relationships, which is commonplace, with the reasonable expectation that the image would not be shared, but then the images were publicly posted without consent and in contravention of the expectations of the individuals (*see. e.g.* Exh. 9 at 2 (████ Decl. at ¶ 7); Exh. 11 at 1 (████ Decl. at ¶ 2)). In other instances the images were taken surreptitiously without the pictured individual's knowledge, much less consent.  Exh. 8 at 4 (Goldberg Decl. at ¶¶ 13, 14).  The injury occurred through the public posting of an intimate image along with personal information.  Exh. 8 at 2-3, 7-8 (Goldberg Decl. at ¶¶ 8-10, 23-25).  Consumers would not know that this information about them and images of them had been posted until after the fact and they were either notified that their information and images had been posted or discovered it themselves, and thus they could not avoid it.  Exh. 8 at 2, 4 (Goldberg Decl. at ¶¶ 7, 13, 14).

Lastly, the substantial harm caused to victim consumers was not outweighed by countervailing benefits.  Defendants provided no benefit to consumers or competition when they solicited intimate images and personal information from ex-partners of individuals depicted in the images and disclosed the images and information without the consent of the individuals depicted on a public website.  There was also no benefit to consumers or competition when Defendants charged or caused others to charge consumers hundreds of dollars or more in fees to remove the intimate images and personal information from the public website.

### b.  Nevada Statute

Plaintiff State of Nevada alleges that Defendants engaged in practices violating Nevada Revised Statute § 598.0923(4), by having a deceptive trade practice when they knowingly used coercion, duress, or intimidation in a transaction.  Defendants EMP and Cottelli knowingly used

coercion, duress, or intimidation in a transaction when they sought payment from consumers to take down the intimate images and personal information of consumers.  Defendants had a practice of soliciting intimate images and personal information from ex-partners of individuals depicted in the images and disclosing the images and information without the consent of the individuals depicted, on a website that enables the public to identify or contact the individuals depicted.  Each time Defendants posted an entry on the website, they used coercion, duress, or intimidation which is a violation of Chapter 598 of the Nevada Revised Statutes, NRS § 598.0923(4).

### 3.  *Eitel* Factors Four Through Seven Also Weigh in Plaintiffs' Favor.

The fourth *Eitel* factor, the sum of money at stake in the action, favors entry of judgment because the monetary judgment sought is warranted in relation to the seriousness of Defendants' conduct.  *See Best W. Int'l*, 2008 U.S. Dist. WL 2003784 at *2.  Defendants operated the website since 2011, and as described in Section II above, Plaintiffs have established that the Defendants' conduct was unfair and, as alleged under Nevada law, that Defendants knowingly used coercion, duress, or intimidation in operating this business.  Plaintiffs seek a monetary judgment of $2,022,930 against Defendants.  The figure represents a reasonably estimated floor to the total consumer injury—it is the amount the 5,070 consumers who were on the site when takedown fees were advertised on the site would have paid to have the images and information removed, based on a conservative estimate of $399 per consumer, despite evidence that many consumers paid substantially more than $399 for removal.  *See e.g.* Exh. 7 at 2 (████ Decl. at ¶ 10-11); Exh. 11 at 1 (████████ Decl. at ¶ 5).  Removals from takedown fees paid to MyEx.com or others were advertised on MyEx.com from at least October 2013 through March 2014.  Exh. 1 at 22-23 (Thomas Decl. at ¶¶ 74-78).  As stated in the Complaint and as supported by evidence submitted in support of this motion, Plaintiffs have established that Defendants' gains resulted from unfair and unlawful practices.

It is appropriate to enter default judgment against both EMP and Cottelli.  Defendant Cottelli is individually liable for this amount because he formulated, directed, controlled, had the

authority to control, or participated in and knew of the acts and practices.  As discussed above, Defendant Cottelli founded EMP, served in multiple official roles during its existence, and then closed down the corporation.  Exh. 6 at 6, 9, 11-12 (IH Transcript at 22, 34, 42-43; 45-46). Cottelli also ran MyEx.com, arranging for services and corresponding with service providers, both on EMP's behalf, and his own.  Exh. 1 at 6, 9-13 (Thomas Decl. at ¶¶ 15, 29-50; Attach. A, page 759; B). Defendant Cottelli also set up bank accounts for EMP.  Exh. 1 at 28 (Thomas Decl. at ¶¶ 99-103, Attach. JJ).

The fifth *Eitel* factor, the possibility of dispute concerning material facts, favors entry of judgment because there is no possibility of dispute—the entry of default establishes the truth of the factual allegations of the complaint.  *See Geddes* at 560; Fed. R. Civ. P. Rule 55(b).  Even if that were not the case, as it is here, the evidence submitted to the court overwhelmingly establishes that Defendants are liable for violations of the FTC Act and Nevada law.  The eight consumer declarations, two FTC staff investigative declarations, and evidence collected through dozens of captures and in response to several Civil Investigative Demands all strongly support the factual allegations of the Complaint.  The sixth *Eitel* factor, whether the default was due to excusable neglect, favors entry of judgment.  Defendants have been duly served with the Complaint and the request for entry of default, but have made no effort to make an appearance in this action.  Thus, Defendants' default is the result of an intentional decision not to defend.

Although the final *Eitel* factor favors deciding cases on the merits whenever possible, in this case this factor nonetheless weighs in favor of entry of default judgment.  Defendants' failures to answer or otherwise respond to the Complaint "makes a decision on the merits impractical, if not impossible."  *Best W. Int'l*, 2008 U.S. Dist. WL 2003784 at *3 (quoting *PepsiCo, Inc.*, 238 F.Supp. at 1177).

Considering the *Eitel* factors in their entirety, default judgment is warranted.  Each of the seven factors weighs in favor of granting the Plaintiffs' motion.  By virtue of their failure to answer or otherwise respond to the Complaint, Defendants have admitted, as a matter of law, to violating Section 5(a) of the FTC Act, as well as Nevada Revised Statute § 598.0923(4), by

knowingly using coercion, duress or intimidation in a transaction.  Accordingly, this Court

should grant the Plaintiffs' Motion for Default Judgment and issue an order that requires

Defendants to disgorge ill-gotten gains.  The Court should further order injunctive and other

equitable relief.

> **C.     The Court Should Enter a Default Judgment for the Requested Injunctive and Equitable Relief against Defendants Because it is Reasonable and Appropriate**
>
> > **1.     The Requested Relief is Reasonable and Appropriate.**

The Commission brought this action under the second proviso of Section 13(b) of the

FTC Act, which provides that "in proper cases the Commission may seek, and after proper proof,

the court may issue, a permanent injunction," against violations of any provision of law enforced

by the FTC.  15 U.S.C. § 53(b).  In fashioning injunctive relief under Section 13(b), the Court

may bring to bear the full range of its inherent equitable powers, including the power to grant

equitable monetary relief in the form of consumer redress, restitution and disgorgement, and any

other ancillary relief necessary to accomplish justice.  *See FTC v. H.N. Singer, Inc.*, 668 F.2d

1107, 1113 (9th Cir. 1982); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir.

1984); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-69 (11th Cir. 1996).  *See also FTC v.*

*Pantron I Corp.,* 33 F.3d 1088, 1102-03 (9th Cir. 1994) (*quoting H.N. Singer*, 668 F.2d at 1113).

Indeed, once the equitable power of a district court has been invoked, the full breadth of the

court's authority is available.  *H.N. Singer*, 668 F.2d at 1113.  The Ninth Circuit has held that

any case alleging violations of a law enforced by the FTC constitutes a proper case for which

injunctive relief may be sought.  *FTC v. Evans Prod. Co*., 775 F.2d 1084, 1086-87 (9th Cir.

1985); *H.N. Singer*, 668 F.2d at 1111-13.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes a court to issue a permanent

injunction whenever a defendant violates any of the laws enforced by the FTC and is likely to

continue to violate such laws.  *See H.N. Singer, Inc.*, 668 F.2d 1112-13 (9th Cir. 1982); *Gem*

*Merchandising*, 87 F.3d at 468; *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal.

2009).  To determine whether a defendant is likely to engage in similar violations in the future, courts look to two general factors: (1) the deliberateness and seriousness of the present violation; and (2) the defendant's past record with respect to deceptive and unfair marketing practices.  *See Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982) (citations omitted).  Prior illegal conduct may be suggestive of likelihood of future violations.  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  "Other circumstances may be weighed, including the adaptability or transferability of the unfair practice to other products."  *Sears, Roebuck and Co.*, 676 F.2d at 392.  "The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present. In the final analysis, [courts] look to the circumstances as a whole and not to the presence or absence of any single factor."  *Id.*  A court may see a defendant's "ready willingness to flout the law" as "sufficient cause for concern regarding further, additional violations" for which injunctive relief may be appropriate.  *Id.*

Such relief may be broader in scope than the illegal conduct at issue.  *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.  Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (citations omitted). Broader "fencing in" provisions help to "prevent similar and related violations from occurring in the future."  *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir. 1979) (citing *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 392 (1959)); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984) (recognizing the necessity to "fence in" violators of the FTC Act given limitless "human inventiveness" to evade orders).

The provisions of the proposed Default Judgment all fall well within the equitable power of this Court.  *See id.*  The proposed Default Judgment imposes a prohibition on Defendants disseminating, through a website or online service, intimate image(s), as defined in the proposed Default Judgment, without a clear and conspicuous notice and obtaining verifiable affirmative express consent in writing from each individual depicted in the intimate image prior to dissemination.  The prohibition is fencing in future conduct and is particularly justified given the

severity of the conduct at issue, and is a similar provision as was entered in the stipulated order for permanent injunction and monetary judgment with co-defendant, Aniello Infante ("Infante Stipulated Order").  Defendant Cottelli's long history of running the site, nonresponsiveness to law enforcement inquiries concerning unconsented intimate images on the site (including intimate images of underage victims), the fact that he maintains custody of the images and information at issue, and his proclivity to move between service providers and create fictitious entities and identities suggests that he would start such a business again, and thus warrants this relief.

The proposed Default Judgment also prohibits Defendants from selling, renting, leasing, disclosing, using, transferring, or otherwise benefitting from personal information—defined in the proposed Default Judgment as information from or about an individual depicted in an intimate image—or intimate images obtained without verifiable affirmative express consent in writing, as is required by the Infante Stipulated Order.[2]  In addition, Defendants must destroy such personal information or intimate images within thirty days, unless otherwise requested by a government agency or required by law, regulation, or court order.  Other related provisions in the proposed order would prohibit Defendants from charging takedown fees, similar to the Infante Stipulated Order, and from creating, using or allowing public access to MyEx.com, or any website that would provide image removal services related to postings of Intimate Images and personal information obtained without affirmative express consent.  This is necessary to ensure that Defendants do not again use intimate images and personal information posted publicly to engage in unfair practices or force consumers to engage in transactions under duress.

---

[2] Courts have upheld this type of relief in similar contexts .  *See Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 304–05 (7th Cir. 2017) (holding that exceptions to a state robocall regulation for messages from school districts to students, parents, or employees, or messages to subscribers with whom the caller has a current relationship, were permissible because the exceptions depend on the relationship between the caller and the recipient, not on what the caller proposes to say), *cert. denied sub nom. Patriotic Veterans, Inc. v. Hill*, 137 S. Ct. 2321 (2017). *See also Bland v. Fessler*, 88 F.3d 729, 733–34 (9th Cir. 1996) (upholding California's robocall statute exempting parties with an existing relationship, and calls from nonprofit organizations to their members, because such exemptions rest on existing relationships implying consent to the receipt of robocalls); *Gresham v. Picker*, 214 F. Supp. 3d 922, 928–35 (E.D. Cal. 2016) (upholding the constitutionality of a statute limiting the use of automatic dialing-announcing devices and the exemptions for parties with an existing relationship with those called).

Additionally, because Defendants operated the website with so many different service providers, the proposed order includes a provision directing third parties to take any steps necessary to ensure that any website by or for Defendants that contains intimate images and personal information of individuals without their affirmative express consent is disabled and no longer viewable or accessible to persons using the internet.  Although the website is currently down, this provision would prohibit Defendants from posting intimate images and personal information in the future.  Lastly, the proposed Default Judgment requires recordkeeping and periodic reporting provisions that are standard in FTC cases to aid the FTC in monitoring defendants' compliance with court orders.  These reporting and recordkeeping requirements will help ensure that the Defendants do not violate the injunctive relief in the proposed order moving forward.

This permanent injunctive relief is warranted and appropriate given the egregiousness of the violations, as stated in Plaintiffs' complaint, and necessary to correct Defendants' unlawful conduct, prevent future violations of the FTC Act and Nevada law, and protect consumers.

> ### 2.   The Court Should Enter a Default Judgment Against Defendants for Equitable Monetary Relief

As discussed above, included in the Court's power to grant equitable relief is the authority to order payment of consumer redress, restitution, and disgorgement.  *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993); *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314-15 (8th Cir. 1991).  The proper amount of disgorgement is total revenue of the enterprise.  *Figgie Int'l Inc.,* 994 F.2d at 605-06.  As set forth below, the evidence submitted by Plaintiffs in support of this Motion establishes that consumer injury caused by Defendants totals at least $2,022,930.

When calculating monetary relief when entering a default judgment, the Court has considerable latitude to determine the amount of damages, and may do so with or without a hearing.  Fed. R. Civ. P. 55(b)(2).  The Court may dispense with a hearing when the amount claimed is capable of ascertainment from definite figures contained in documentary evidence or in detailed declarations or affidavits.  *See Florida Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 783

(11th Cir. 1993) (once default judgment established liability, court awarded damages based upon affidavit of "proof of damages" submitted by plaintiff); *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983) (A judgment by default awarding damages may be entered without a hearing where "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits."); *Leedo Cabinetry v. James Sales & Distrib., Inc.*, 157 F.3d 410, 414 (5th Cir. 1998) (affirming default judgment without hearing where damages capable of mathematical calculation). Defendant Cottelli is individually liable for this amount because he formulated, directed, controlled, had the authority to control, or participated in the acts and practices, as discussed above.

The facts of the Commission's Complaint having been taken as true, and the amount of equitable monetary relief having been established by evidence submitted by Plaintiffs, the Court should enter the Default Judgment for equitable monetary relief in the amount of $2,022,930 (Section VI of the Proposed Order). This figure represents a reasonably estimated floor to the total consumer injury—as it is the amount the 5,070 consumers who were on the site when takedown fees were advertised on the site would have paid to have the images and information removed, based on a conservative estimate of $399 per consumer (despite evidence that many consumers paid substantially more than $399 for removal). This disgorgement is justified, particularly in light of the fact that MyEx.com also generated significant amounts of money from advertising on MyEx.com. For example, from May 2015 through May 2017, the site generated over $117,000 in advertising profits. Exh. 1 at 30 (Thomas Decl. at ¶¶ 112-115; Attach. TT). Moreover, between December 2011 and April 2016 (excluding 2013), a total of $5,915,430.51 was deposited into EMP's accounts. Exh. 5 at 3 (Van Wazer Decl. at ¶ 6). Further disgorgement from Defendants is appropriate, as Defendant Aniello Infante settled the allegations of this complaint with Plaintiffs with a stipulated order that included a monetary provision of $205,000 in favor of the Plaintiffs, with partial suspension of the judgment. ECF No. 9.

IV.     **CONCLUSION**

     For the foregoing reasons, Plaintiffs request that the Court grant their motion and enter Default Judgment against Defendant EMP and Defendant Cottelli.  A proposed order is attached.

Dated:  June 11, 2018          Respectfully submitted,
                           Alden Abbott
                           General Counsel

                           /s/ Megan Cox
                           MEGAN COX
                           ALLISON M. LEFRAK

                           Attorneys for Plaintiff
                           Federal Trade Commission
                           600 Pennsylvania Avenue NW
                           Mailstop CC-8256
                           Washington, DC 20580
                           Telephone: 202-326-2282 (Cox)
                           Telephone: 202-326-2804 (Lefrak)
                           Facsimile: 202-326-3392
                           Email: mcox1@ftc.gov, alefrak@ftc.gov

                           /s/ Laura Tucker
                           LAURA TUCKER
                           Senior Deputy Attorney General, Bureau of Consumer Protection
                           Office of the Attorney General
                           100 North Carson Street
                           Carson City, NV 89701-4717
                           Phone (775) 684-1244
                           Facsimile: (775) 684-1170
                           Email: LMTucker@ag.nv.gov

**Certificate of Service**

I, Megan Cox, certify that on June 11, 2018, a true and correct copy of the foregoing was filed and served using the Court's ECF system.

I further certify that on this same date, a true and correct copy of the foregoing was served, via email or overnight mail to the following non-ECF participants.

Defendant EMP Media, Inc.
Registered Agent Aniello Infante
3016 Spring Meadow Circle
Youngstown, OH 44515-4953

Defendant Shad "John" Applegate, also known as Shad Cottelli
shadapplegate@gmail.com
shadcottelli@gmail.com
eroticmp@gmail.com
enzovalentino@protonmail.com

/s/ Megan Cox
Megan Cox
Federal Trade Commission