# In the Matter of:

# MyEx.com

*March 28, 2017*
*Aniello Infante*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

## Page 1

```
 1                  FEDERAL TRADE COMMISSION
 2                         I N D E X
 3
 4   WITNESS:                                    EXAMINATION:
 5   ANIELLO INFANTE
 6      BY MS. COX                                    4
 7
 8   EXHIBITS         DESCRIPTION               FOR ID
 9   Number 1      Civil Investigation Demand      10
10   Number 2      Infante's responses to CID      33
11   Number 3      NV Sec. of State records        40
                   regarding EMP Media, Inc.
12
     Number 4      NV Sec. of State EMP Media      42
13                 Articles of Incorporation
14   Number 5      Landing page for MyEx.com       47
                   from 12/11/12
15
     Number 6      MyEx.com Privacy Policy         47
16
     Number 7      MyEx.com Terms of Use           49
17
     Number 8      MyEx.com Removal Policy         51
18                 from 2013
19   Number 9      Reputationprotector.com         52
                   document
20
     Number 10     Add Your Ex form from 9/30/12   55
21
     Number 11     Complaint, Lipson vs. EMP       56
22                 Media, Inc., et al
23   Number 12     Complaint, Righthaven vs.       57
                   EMP Media, Inc., et al
24
     Number 13     EMP Bank Acct. ▮▮▮▮▮            65
25                 documents regarding opening of account
```

## Page 2

```
 1                  FEDERAL TRADE COMMISSION
 2                         I N D E X
 3
 4   EXHIBITS         DESCRIPTION               FOR ID
 5   Number 14     EMP Bank Acct. ▮▮▮▮▮            66
                   Statement May 2014
 6
     Number 15     EMP Bank Account ▮▮▮▮▮          67
 7                 Statement July 2014
 8   Number 16     EMP Bank Account ▮▮▮▮▮          68
                   Statement September 2014
 9
     Number 17     EMP Bank Account ▮▮▮▮▮          69
10                 Statement October 2014
11   Number 18     EMP Bank Account ▮▮▮▮▮          71
                   Statement January 2015
12
     Number 19     Chase Bank Acct. ▮▮▮▮▮          73
13                 for EMP Media Opening Documents
14   Number 20     Chase Bank Cashier's Check for  74
                   $2,000 to Franklin Blair Title Agency
15
     Number 21     Chase Acct. Withdrawal for      75
16                 $500 to Infante
17   Number 22     Chase Acct. withdrawal to       76
                   EMP Media
18
     Number 23     Chase Acct. ▮▮▮▮▮               82
19                 Documents
20   Number 24     Chase Statement Acct.           84
                   ▮▮▮▮▮ February 2011
21
     Number 25     Chase Statement Acct.           84
22                 ▮▮▮▮▮ March 2011
23   Number 26     Chase Statement Acct.           85
                   ▮▮▮▮▮ June 2011
24
25                  FEDERAL TRADE COMMISSION
```

## Page 3

```
 1                         I N D E X
 2
 3   EXHIBITS         DESCRIPTION               FOR ID
 4   Number 27     Chase Statement Acct.           86
                   ▮▮▮▮▮ December 2011
 5
     Number 28     Chase Statement Acct.           90
 6                 ▮▮▮▮▮ January 2012
 7   Number 29     Chase Statement Acct.           92
                   ▮▮▮▮▮ March 2012
 8
     Number 30     CitiBank Account Transactions   93
 9
     Number 31     CitiBank Account Transactions   94
10
     Number 32     CitiBank Account Transactions   96
11
12   EXHIBITS RETAINED BY MS. COX
13
```

## Page 4

```
 1                  FEDERAL TRADE COMMISSION
 2
 3
 4   IN THE MATTER OF      )  Matter No.
 5   MYEX.COM              )  1623052
 6   --------------------- )
 7
 8
 9              Tuesday, March 28, 2017
10
11              Office of John B. Juhasz, Esquire
12              7081 West Boulevard
13              Suite 4
14              Youngstown, Ohio  44512
15
16       The above-entitled matter came on for
17   investigational hearing, pursuant to notice, at 10:00 a.m.
```

## Page 5

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
   Megan E. Cox, Attorney
   Allison M. Lefrak, Attorney
   Federal Trade Commission
   600 Pennsylvania Avenue, NW
   Washington, DC  20580
   (202) 326-2282
   (202) 326-2804
   mcox1@ftc.gov
   alefrak@ftc.gov

ON BEHALF OF ANIELLO INFANTE:
   John B. Juhasz, Attorney
   7081 West Boulevard
   Suite 4
   Youngstown, Ohio  44512
   (330) 758-7700

## Page 6

PROCEEDINGS
- - - - -
Whereupon--
           ANIELLO NEIL INFANTE
a witness, called for examination, having been first duly sworn, was examined and testified as follows:
           EXAMINATION
           BY MS. COX
   Q.   Good morning.  I'm Megan Cox, and I'm a staff attorney at the Federal Trade Commission in the division of privacy and identity protection.  With me today is Allison Lefrak, also a staff attorney at the FTC.  Let the record reflect that this proceeding was convened at 10:05 a.m., March 28th, 2017, at the offices of John Juhasz in Youngstown, Ohio.  This is a nonpublic proceeding of the Federal Trade Commission.
   I represent the Federal Trade Commission.  I am here today for the purpose of gathering information related to a commission investigation of MyEx.com, which I will refer to as MyEx during this proceeding.  This proceeding relates to the Commission's investigation to determine whether MyEx has engaged or is engaging in any unfair or deceptive acts or practices in it or affecting commerce in violation of the Federal Trade Commission Act.
   The procedures for this investigational hearing are

## Page 7

outlined in the Commission's Rules of Practice, specifically Part 2, nonadjudicative procedures, subpart A, which pertains to investigations and investigational hearings, beginning with Sections 2.1 through 2.14.  The attention of counsel is invited to Section 2.9 of these rules, which provide that any person compelled to appear and testify or produce documentary evidence may be accompanied, represented, and advised by counsel according to the Federal Trade Commission rules.  Representation by counsel in this hearing will be in accordance with the rules as prescribed by Section 2.9, Subparts B1 through B5.
   I'm here today to speak with -- I'm here to speak with you today about the topics outlined in the Civil Investigative Demand that I've marked here as Exhibit 1 in this proceeding.  In order to facilitate reference during the hearing, I request copies of the Commission's resolution form of compulsory process specifications to Mr. Infante be placed into the record as Commission's Exhibit 1.  I would add that all exhibits submitted in the course of this hearing will be retained for copying purposes by Commission counsel and are not the responsibility of the reporter.
   Now, I have a few preliminary instructions and questions for you.  Please state your full name for the

## Page 8

record.
   A.   Aniello Infante.
   Q.   Are you represented by counsel today?
   A.   Yes.
   Q.   And who is that?
   A.   Attorney John Juhasz.
   Q.   Okay.  Have you ever had your deposition taken or given testimony before?
   A.   No.
   Q.   Today, I'm going to ask you questions that relate to issues we're investigating about MyEx.  Your answers will be recorded by our court reporter, who can only transcribe oral responses.  Therefore, it is important that you respond to my questions orally and not with gestures; you understand?
   A.   Yes.
   Q.   Also, it is important that we not speak over one another.  Please wait until I have finished asking a question before you answer and, likewise, I will do my best not to interrupt your answers; do you understand?
   A.   Yes.
   Q.   If you do not understand any question I ask, please tell me so that I may explain it or rephrase it; do you understand?
   A.   Yes.

### Page 9

1   Q. We will take breaks for the benefit of you and
2   our court reporter. If at any time you would like to take
3   a break, please just let me know, and we will do just
4   that. If there is a question pending or if you are in the
5   middle of answering a question, I will ask you to finish
6   answering, and then we'll take a break. Do you
7   understand?
8   A. Yes.
9   Q. If at some point later during the
10  investigational hearing you remember some information that
11  makes you think a previous answer that you gave is
12  incomplete or incorrect, please let me know that you would
13  like to add something or correct an earlier answer, and we
14  can do that while the information is fresh in your mind;
15  do you understand that?
16  A. Yes.
17  Q. Following the completion of my examination, you
18  may request to clarify any answers in order that we may --
19  in order that they may not be left equivocal or incomplete
20  for the record. If when you're answering a question, you
21  think there might be a document that could help you answer
22  the question more completely or accurately, please let me
23  know. We may have those documents here with us today.
24  Will you do that?
25  A. Yes.

### Page 10

1   Q. If you do not know or do not remember the
2   information necessary to answer a question, please just
3   say so. Do you understand?
4   A. Yes.
5   Q. Is there any reason that you would not be able
6   to testify completely, truthfully, and accurately today?
7   A. No.
8   Q. Such as taking any medications that might
9   impair your senses?
10  A. No.
11  Q. Thank you. I've handed you a document that has
12  been marked as Exhibit 1, and please note that the
13  exhibits are two-sided when you're flipping through it.
14  A. Okay.
15  Q. I'll represent that Exhibit 1 is the Civil
16  Investigative Demand issued to you, Aniello Neil Infante,
17  by the FTC in the Commission's investigation. Please take
18  a moment to review the document.
19  A. These are same.
20  Q. Have you seen the document marked as Exhibit 1
21  before?
22  A. Yes.
23  Q. When?
24  A. When you first mailed them out to me back in, I
25  want to say, August.

### Page 11

1   Q. So you received the CID through Fed Ex?
2   A. Through Fed Ex; correct.
3   Q. Do you understand that this document requires
4   you to testify here today?
5   A. Yes.
6   Q. Can you please flip to Page 11 of the
7   specifications and review the specifications for oral
8   testimony listed on Page 11 to 12, which are the topics on
9   which I'm seeking testimony today.
10  A. Page 11. Okay.
11  Q. Okay.
12  A. Okay. So -- oh.
13  Q. You've had a chance to review the topics?
14  A. Correct; yes.
15  Q. And now, please turn to review the
16  interrogatory requests, Pages 6 through 9.
17  A. Okay.
18  Q. Have you had a chance to review it?
19  A. Yes.
20  Q. Now please turn to Page 1 of the CID form. And
21  on there, you will see there is a date and time for
22  documents and Answers to Interrogatories of September
23  12th, 2016. On the front page, I'm sorry.
24  A. Okay. Yes.
25  Q. Do you see the date of September 12th, 2016 --

### Page 12

1   A. Yes.
2   Q. -- for the documents and answers? Did you
3   produce answers and documents by September 12th, 2016?
4   A. No, I did not.
5   Q. And did you receive letters from the Commission
6   stating you were not in compliance with the CID?
7   A. No. Or, I'm sorry, can you repeat the
8   question?
9   Q. Did you receive letters from myself, staff at
10  the Federal Trade Commission stating that you were not in
11  compliance with the Civil Investigative Demand?
12  A. Yes.
13  Q. And that it would be enforced through our
14  Office of General Counsel?
15  A. Yes.
16  Q. And did you learn of our enforcement action in
17  federal court in this matter?
18  A. Yes.
19  Q. How did you learn of the Commission's filed
20  enforcement action?
21  A. Actually by -- just by a news article, a news
22  article I saw on WFMJ.com.
23  Q. And how did you find the news article? You
24  were just reading the news?
25  A. Yeah, I read, you know, WFMJ, just looking

### Page 13

1  through that, and I saw, you know, feds want Austintown
2  man. And it was me, my name. So --
3  **Q. And so in response to that, you were in touch**
4  **with the Commission, and you did produce your**
5  **interrogatory responses; correct?**
6  A. Correct. Then I hired an attorney, Attorney
7  Juhasz. We sat down and answered the questions that were
8  produced in the CID.
9  **Q. And did you have any documents to produce to**
10 **the Commission?**
11 A. No.
12 **Q. And do you have any documents with you here**
13 **today to produce to the Commission?**
14 A. Just the answers from -- from what Attorney
15 Juhasz sent you.
16 **Q. And that was already produced?**
17 A. Okay. Yeah.
18 **Q. So did you do anything to prepare for the**
19 **hearing today? Did you --**
20 A. Go ahead.
21 **Q. Did you review any other documents besides your**
22 **interrogatory responses?**
23 A. Oh, no.
24 **Q. Did you speak with anybody about MyEx.com or**
25 **EMP Media?**

### Page 14

1  A. No.
2      MR. JUHASZ: Objection. Aside from his
3  counsel?
4  **Q. Aside from counsel.**
5  A. Okay. No.
6  **Q. What is your educational background? I guess**
7  **I'd like to ask a few questions. Beginning with high**
8  **school, if you could explain your education background.**
9  A. Yeah. Completed high school. I went on to
10 become an X-ray technician -- technologist. That was an
11 Associate's degree. And then that's as far as education
12 wise.
13 **Q. And are you currently employed?**
14 A. Yes, I am.
15 **Q. Where?**
16 A. At General Motors.
17 **Q. And how long have you been employed there?**
18 A. Seventeen years.
19 **Q. And where did you -- did you have any previous**
20 **employment previous to GM?**
21 A. Cleveland Clinic for two years.
22 **Q. And what was your title there?**
23 A. X-ray technologist.
24 **Q. And any employment prior to that?**
25 A. I lived -- Imperial Palace in Las Vegas. I was

### Page 15

1  a bartender. That was in between, I'm sorry, Cleveland
2  Clinic and General Motors in 1997.
3  **Q. And were you previously employed at EMP Media,**
4  **Inc.?**
5  A. Well, in '08. That's when I was put on the
6  corporation as -- as an employee, I guess.
7  **Q. And what was your position there? Did you have**
8  **a title?**
9  A. Well, I was put on the title as president,
10 secretary, but it was used to -- to obtain credit card
11 machine -- a merchant processing machine.
12 **Q. And a merchant processing machine is?**
13 A. To take credit cards for the business.
14 **Q. And you said this was in 2008 that you were put**
15 **on the documents for this corporation?**
16 A. Correct; yes.
17 **Q. And do you know who else worked for EMP Media,**
18 **Inc.?**
19 A. Shad Applegate.
20 **Q. Any others?**
21 A. And later, like a year later, Burak Baskan, I
22 think, who I met once or twice.
23 **Q. And on your interrogatory responses, you also**
24 **mentioned businesses associated with you. Were you**
25 **previously associated with Global Computer Enterprises?**

### Page 16

1  A. Yes. That's -- but there was no -- just
2  opening up a corporation in Nevada. That was -- that's
3  all it did. Nothing --
4  **Q. And who opened up the corporation in Nevada?**
5  A. I did.
6  **Q. And what was the business?**
7  A. Computer business.
8  **Q. Reselling computers?**
9  A. Correct.
10 **Q. And did you work with anyone on this business?**
11 A. No.
12 **Q. So who were the customers for this business?**
13 A. There was no -- I mean, like I said, it didn't
14 do any business at all. I just opened up the corporation.
15 **Q. Okay.**
16 A. There was no --
17 **Q. And Mosquito -- were you previously associated**
18 **with Mosquito Marketing, LLC?**
19 A. Yes, I was put on that corporation to -- to try
20 to obtain a merchant account for Mosquito.
21 **Q. And was this a business you opened?**
22 A. No, I did not.
23 **Q. Who opened this business?**
24 A. Eun E. Kim.
25 **Q. Who is that?**

                                                                       21
1    Q.  And do you draw a salary related to this
2    company?
3    A.  No.
4    Q.  And what is the status of this company today?
5    A.  I think it's dissolved, I want to say.
6    Q.  But your name was on corporate records at some
7    point related to Top Hat, Incorporated?
8    A.  Yeah, I think so, yeah.
9    Q.  You also put down the company VIP Host
10   International, LLC.  What is this company?
11   A.  That's just -- was going to be used to -- for
12   VIP services in Las Vegas.
13   Q.  What do you consider VIP services?
14   A.  They -- taking people to clubs or golfing or --
15   that was the main purpose, you know.  People coming to
16   Vegas, they like a chauffeur, more or less.
17   Q.  And who did you work with to create this
18   company?
19   A.  Myself and Shad Applegate.
20   Q.  And what is the status of this company today?
21   A.  It's doing nothing at all.
22   Q.  Did you draw a salary related to VIP Host
23   International?
24   A.  No.
25   Q.  Was anyone else associated with it besides you

                                                                       22
1    and Shad Applegate?
2    A.  No.
3    Q.  So now I'd like to speak a bit more about EMP
4    Media.  You mentioned having a merchant account related to
5    it, and that you had the title over the years of
6    president, treasurer, secretary.  How did those titles
7    relate to having a merchant account for EMP Media?
8    A.  Well, when you apply for a merchant account,
9    they want to know, you know, how are you associated with
10   EMP Media.  So I was put on as president, secretary,
11   director.
12   Q.  And what can you tell me about EMP Media's
13   business?
14   A.  They are more creating web sites, advertising,
15   and marketing also.
16   Q.  And who does the creation of the web sites, the
17   advertising, and the marketing?
18   A.  From what I recall, Shad Applegate and Burak
19   Baskan.  He was the IT, I guess, person.
20   Q.  And beyond marketing, ads, and web sites, were
21   there any other products or services that it provided?
22   A.  Not that I recall.
23   Q.  How did you come to be associated with EMP
24   Media?
25   A.  Well, I -- friends with Shad Applegate, and he

                                                                       23
1    created a company, and he, you know, asked me, do I want
2    to be on this corporation, to try to get a merchant
3    account.  Because I had the good credit; he didn't.  And
4    then that's when he said, you know, he'll pay me a salary
5    and also a car payment once a month.  So I said, you know,
6    fine; sure.
7    Q.  And when did that start, the arrangement where
8    you were getting a salary and a car payment for being on
9    the --
10   A.  Yeah, about '08, 2008.  I can't recall what
11   month.
12   Q.  And through what time did this -- did your --
13   were you part of the corporation that allowed EMP Media to
14   exist?
15   A.  As far as getting the salary or --
16   Q.  Sure, salaried.
17   A.  Yeah, up until 2015, I want to say.
18   Q.  And why did it stop in 2015, the salary?
19   A.  It was -- I think the company dissolved.  It
20   was producing nothing.  No income.
21   Q.  So your understanding is that EMP Media
22   dissolved, because it was no longer earning an income?
23   A.  Correct.
24   Q.  Because it was no longer creating web sites and
25   advertising?

                                                                       24
1    A.  From what I -- yeah.  From what I was told, you
2    know, I -- I never -- you know, did anybody web sites or
3    -- for the company.
4    Q.  Who told you that it was dissolving?
5    A.  Shad Applegate.
6    Q.  How did he tell you?
7    A.  Probably through E-mail.
8    Q.  Do you still work with or for anyone who worked
9    at EMP Media, Inc.?
10   A.  No.
11   Q.  Who else worked at EMP Media?
12   A.  From what I recall, just them two, Shad and
13   Burak.
14   Q.  Who was in charge of EMP Media?
15   A.  I'd say day-to-day in Vegas was Shad Applegate.
16   Q.  So you did not have any responsibilities for
17   the day-to-day administration --
18   A.  No.
19   Q.  -- of EMP Media?
20   A.  No.
21   Q.  Did you ever visit EMP Media's offices?
22   A.  I'd say twice.
23   Q.  Can you describe the circumstances under which
24   you visited their offices?
25   A.  Just from -- just maybe going in, just seeing

                                                                              29
1     he call you or did you call him?
2         A.   I had called him.
3         Q.   Why did you call him?
4         A.   No, just to say that, hey, next Tuesday, that's
5     the -- that's when I go for that Civil, you know,
6     Investigative Demand.  So --
7         Q.   And you called him -- did you call him on the
8     phone number that you provided us as his phone number in
9     your interrogatory responses?
10        A.   Yeah, I believe so.
11        Q.   Is there any other contact information you have
12    for him, besides the phone number and the E-mail address
13    that was the Gmail address you provided a few minutes ago?
14        A.   No.
15        Q.   Do you know where he was when you spoke with
16    him on the phone?
17        A.   No.
18        Q.   And prior to speaking to him a week ago,
19    previous to that, when was the last time you had
20    communicated with him?
21        A.   Maybe a month or so, maybe through E-mail
22    conversation.
23        Q.   And is that content of your other
24    communications related to business or personal or?
25        A.   Just, yeah, probably personal, you know.

                                                                              30
1         Q.   You consider him a friend, and you communicate
2     to catch up about life and other things?
3         A.   Yeah; yeah.
4         Q.   How often do you speak with him on the phone?
5         A.   Oh, maybe -- maybe once a month, I'd say.
6         Q.   And prior to a week ago, had you told him about
7     our investigations and prior attempts to meet with you
8     about EMP Media, Inc.?
9         A.   Correct; yeah.  I do, yeah.
10        Q.   And what was his reaction when you first told
11    him about our investigation?
12        A.   That it's -- you know, they're going to ask you
13    questions, I guess, or -- I don't know if he knew, but he
14    just said, I mean, maybe you do have to go, I mean, to
15    answer the question because you're on the corporation, you
16    know, so --
17        Q.   When was the last time you saw him in person?
18        A.   It's probably been about two or three years
19    ago.
20        Q.   What is Shad Applegate's nationality?
21        A.   Oh, boy.  I think he told me Belgium.  Put
22    Belgium, Belgiumese.
23        Q.   He was born in Belgium?
24        A.   No, I don't think he was born in Belgium.  But
25    as far as, like I'm Italian.  I wasn't born in Italy.

                                                                              31
1         Q.   Do you know what his citizenship is?
2         A.   US citizen.
3         Q.   And you're saying he likes to travel.  Do you
4     know where he travels to?
5         A.   I mean, throughout the -- throughout the world.
6     You know, different places.
7         Q.   Does he have a home address?
8         A.   I believe -- I don't know exactly, but, I mean,
9     I thought -- pretty sure Las Vegas.
10        Q.   So when he's not traveling abroad, when he's in
11    the United States, he's typically in Las Vegas?
12        A.   Correct.
13        Q.   Where did you see him when you last saw him two
14    to three years ago?
15        A.   Las Vegas.
16        Q.   Where specifically in Las Vegas?
17        A.   I think he picked me, you know -- where did I
18    stay at?  Oh, boy.  I think I stayed at the Mirage, and he
19    picked me up, and we went out for dinner and drinks.
20        Q.   Has he gone by any other names that you know
21    of?
22        A.   No.
23        Q.   Does he have a significant other at this time?
24        A.   Not that I know.
25        Q.   Do you know anyone else who knows him or knows

                                                                              32
1     where he is?
2         A.   No.
3         Q.   Is there any other information you have about
4     him that would help us locate him?
5         A.   No.
6         Q.   Do you know an individual by the name of Jason
7     Fisher?
8         A.   Yes.
9         Q.   Who is he?
10        A.   If I understand, he was the corporate attorney
11    for EMP Media.
12        Q.   And how long have you known Jason Fisher?
13        A.   Probably about three years now.
14        Q.   When did you first meet him?
15        A.   Probably about three years ago.  At the same
16    time when I went out and saw Shad, we -- we went to
17    Jason's.
18        Q.   And where was Jason's?
19        A.   Jason's house.  In Las Vegas.
20        Q.   And what was his role at EMP Media?
21        A.   He was the corporate attorney.  That's what I
22    was led to believe.
23        Q.   What services did he provide for EMP Media?
24        A.   Oh, I -- you know, lawyer services.  I --
25    that's all I know.

                                                                    33
1   Q.  Do you still have a relationship or have you
2   been in contact with Jason Fisher in the last year?
3   A.  Yes.  I sent him also this Civil Investigative
4   Demand.
5   Q.  Why did you send the CID to Jason Fisher?
6   A.  Because it dealt with EMP Media.  And he's the
7   corporate lawyer.
8   Q.  And had you met with him regularly in your
9   capacity as president or treasurer or interacted with him
10  in that capacity about EMP Media?
11  A.  No, just -- I just, like I said, knew that he
12  was the corporate lawyer.
13       MS. COX:  Could we go off the record?
14  (Discussion off the record)
15  Q.  I've handed you a document that has been marked
16  as Exhibit 2.  Please review this document.  Do you
17  recognize this document?
18  A.  Yes, I do.
19  Q.  What is it?
20  A.  It's my responses to the Civil Investigative
21  Demand.
22  Q.  Please turn to Page 4 of the document.
23  A.  Okay.
24  Q.  Midway down the page, it states, based upon
25  information furnished to respondent by Shad Applegate,

                                                                    34
1   respondent believes that Mr. Applegate maintained a web
2   site known as Erotic MP; do you see that?
3   A.  Yes.
4   Q.  What information led you to believe that Mr.
5   Applegate maintained this web site?  Did Mr. Applegate
6   tell you that?
7   A.  Oh, yes.
8   Q.  When did Mr. Applegate tell you that?
9   A.  Probably '08 or '09.
10  Q.  And why did this web site exist?
11  A.  From what I understand, it's just marketing for
12  different massage parlors and clubs.
13  Q.  Does it still exist today?
14  A.  Not that I know of, no.
15  Q.  Were you ever on any documents related to
16  Erotic MP?
17  A.  I think it was associated with EMP Media, so
18  that's how I was on as the president, yeah.
19  Q.  Okay.  And do you know if Erotic MP was related
20  to MyEx.com?
21  A.  No.
22  Q.  It was not associated with MyEx or you don't
23  know?
24  A.  Yeah, I don't know, I guess.
25  Q.  Okay.  Please turn to Page 5 of the exhibit.

                                                                    35
1   Midway down, it states, I helped Shad Applegate set up the
2   company, and he used my name and credit to obtain credit
3   card processing.  Beyond that, I had --
4        MR. JUHASZ:  I'm sorry, where are you,
5   please?
6   Q.  Page 5.
7        MR. JUHASZ:  Yeah, what --
8   Q.  Midway down the page.
9        MR. JUHASZ:  Oh, the answer to Interrogatory
10  No. 5?
11  Q.  5A.
12       MR. JUHASZ:  Okay.  See it, Neil, 5A?
13  A.  Yeah.  Okay.
14  Q.  What do you mean that you helped Shad Applegate
15  set up the company?
16  A.  As far as, like, when you set up a corporation,
17  you have to put down a president, secretary, CEO, through
18  Las Vegas, you know, Secretary of State.  So he -- that's
19  what he was telling me.  He was using my name to put it
20  on.  Then we're going to go after a merchant account.
21  Q.  Did you receive any mail or other
22  communications in incorporating the corporation?
23  A.  No, not --
24  Q.  Anything else related to how the corporation
25  was incorporated that we should know about?

                                                                    36
1   A.  No.
2   Q.  Were you ever contacted related to the credit
3   card processing account?
4   A.  No.  I think they would just -- I filled out
5   paperwork, you know, putting my name, Social Security
6   number.
7   Q.  What paperwork did you fill out?
8   A.  Oh, boy.  It would be like an application.
9   Q.  And who was the application submitted to?
10  A.  Oh, boy.  I -- I don't recall.  It's been that
11  long.
12  Q.  Did you keep a copy of the application?
13  A.  No, I don't think I did.
14  Q.  And for credit card processing, why would EMP
15  Media, Inc., need a credit card processor?
16  A.  From what I recall, it's if people want to
17  advertise on Erotic MP or if they want to -- another thing
18  is they buy and sell advertising to -- kind of like
19  Google.  They buy advertising, then they sell it to
20  different sites to make them -- how is it put, to make
21  them -- to make them number one on a certain page, or a
22  Google page.
23  Q.  So a high search response results?
24  A.  Yeah; correct; yes.
25  Q.  Thank you.  Do you know a person by the name of

|  | 37 |
|---|---|
| 1 | **James Lynch?** |
| 2 | A.  No. |
| 3 | Q.  **If you flip back to Page 4 of your response.** |
| 4 | **At the bottom, the answer to No. 4 B in response to** |
| 5 | **asking, identify the individuals who have provided** |
| 6 | **services for the web site.  You replied, respondent has no** |
| 7 | **firsthand knowledge of any individuals who provided** |
| 8 | **services for the web site.  Respondent on one or two** |
| 9 | **occasions met Burak Baskan, who was described as the** |
| 10 | **corporate IT guy.  What were the circumstances of the** |
| 11 | **meeting in which you met Burak Baskan?** |
| 12 | A.  Oh, just -- just from Shad telling me he's my, |
| 13 | you know, information technology, IT, you know. |
| 14 | Q.  **Where were you when you met Burak Baskan?** |
| 15 | A.  At the office in Las Vegas. |
| 16 | Q.  **Was anyone else there besides you and Shad and** |
| 17 | **Burak Baskan?** |
| 18 | A.  No, I don't recall, no. |
| 19 | Q.  **And was this three years ago?** |
| 20 | A.  This was probably about five. |
| 21 | Q.  **And do you know where Burak Baskan is today?** |
| 22 | A.  No. |
| 23 | Q.  **Do you have any way of contacting Burak Baskan?** |
| 24 | A.  No. |
| 25 | Q.  **You said he was the IT guy.  Do you know** |

|  | 38 |
|---|---|
| 1 | **anything else about his duties related to Erotic MP,** |
| 2 | **MyEx.com, or EMP Media?** |
| 3 | A.  No. |
| 4 | Q.  **Do you know a person by the name of Dena Renee** |
| 5 | **Wright?** |
| 6 | A.  No. |
| 7 | Q.  **Or Dean Renee Wright?** |
| 8 | A.  No. |
| 9 | Q.  **Do you know a person by the name of Bogden** |
| 10 | **Prunes?** |
| 11 | A.  No. |
| 12 | Q.  **Do you know a person by the name of B -- or** |
| 13 | **first initial B. Lambert?** |
| 14 | A.  No. |
| 15 | Q.  **And you've mentioned a person, Eun E. Kim,** |
| 16 | **earlier today?** |
| 17 | A.  Uh-huh. |
| 18 | Q.  **Do you know where Eun Kim is today?** |
| 19 | A.  No, I do not. |
| 20 | Q.  **Do you have any way of being in touch with Eun** |
| 21 | **Kim?** |
| 22 | A.  No. |
| 23 | Q.  **Do you know what state Eun Kim lived in when** |
| 24 | **you met her?** |
| 25 | A.  I don't know what -- I met her in Vegas.  I |

|  | 39 |
|---|---|
| 1 | don't know if she was, you know -- I assume she was living |
| 2 | there.  That's, you know -- |
| 3 | Q.  **And do you know, does she travel abroad?** |
| 4 | A.  No, I don't know that, no. |
| 5 | Q.  **Do you know anything about Diro Media, LLC?** |
| 6 | A.  No. |
| 7 | Q.  **D-I-R-O Media?  Do you know of the company Web** |
| 8 | **Traffic Networks?** |
| 9 | A.  No. |
| 10 | Q.  **Do you know of the corporation T and A Media,** |
| 11 | **Incorporated?** |
| 12 | A.  No. |
| 13 | Q.  **Do you know of the corporation Hot Media,** |
| 14 | **Limited?** |
| 15 | A.  I mean, that I do recall. |
| 16 | Q.  **What do you know about Hot Media, Limited?** |
| 17 | A.  I think Shad had mentioned he had purchased a |
| 18 | domain name, Hot.com.  And that maybe -- maybe Hot Media |
| 19 | and them are together or -- that's about it on that. |
| 20 | Q.  **And when did Shad mention that he bought** |
| 21 | **Hot.com?** |
| 22 | A.  This was about three years ago, I want to say. |
| 23 | Q.  **Do you know of ADT Search Media?** |
| 24 | A.  No. |
| 25 | Q.  **Do you know about Internet Secrets, LLC?** |

|  | 40 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  **When you spoke to Shad Applegate a week ago,** |
| 3 | **did you mention to him that the FTC was trying to locate** |
| 4 | **him or did he mention to you that the FTC was trying to** |
| 5 | **locate him?** |
| 6 | A.  No. |
| 7 | Q.  **Do you know where Shad Applegate works now?** |
| 8 | A.  No.  I mean, probably his own companies, you |
| 9 | know.  I don't -- |
| 10 | MR. JUHASZ:  Okay.  Wait.  Don't say |
| 11 | probably.  You either know where he works or you don't. |
| 12 | If you do, tell her. |
| 13 | A.  Yeah.  No, I don't know. |
| 14 | Q.  **Do you have any idea about how he makes money** |
| 15 | **to travel and pay his bills?** |
| 16 | A.  No. |
| 17 | Q.  **I've handed you a document that has been marked** |
| 18 | **as Exhibit 3.  Please review the document.  As you can** |
| 19 | **see, this is a document from the Nevada Secretary of** |
| 20 | **State, and it is regarding EMP Media, Inc.  Do you see** |
| 21 | **that this is reflecting Secretary of State records related** |
| 22 | **to EMP Media, Inc.?** |
| 23 | A.  Yes. |
| 24 | Q.  **Do you see where it lists you as the registered** |
| 25 | **agent?** |

                                                                    41
1      A.   Yes.
2      Q.   Have you ever been served papers in this
3   capacity as the registered agent for EMP Media, Inc.?
4      A.   Served papers as -- I don't understand.
5      Q.   In any capacity of EMP Media, Inc., being sued
6   or any official business related to EMP Media?
7      A.   Not me personally, no.
8      Q.   And do you see where it lists officers of
9   secretary, president, treasurer, and director?  It lists
10  your name --
11     A.   Yes.
12     Q.   -- Aniello Infante?
13     A.   Yes.
14     Q.   And did you have any day-to-day duties in any
15  of these capacities?
16     A.   No.
17     Q.   And do you see the address of 6130 Flamingo
18  Road, No. 732, Las Vegas, Nevada?
19     A.   Yes.
20     Q.   Do you know that to be the corporate address of
21  EMP Media, Inc.?
22     A.   Yes.
23     Q.   Do you know of any other way to contact
24  anybody -- Shad Applegate or any other corporate officers
25  of EMP Media, Inc.?

                                                                    42
1      A.   No.  Just by attorney, I'd say, Jason Fisher.
2      Q.   And is there any documents you would have to
3   identify any other places of business at which EMP Media,
4   Inc., operated at?
5      A.   No, I don't.
6      Q.   I've handed you a documented that has been
7   marked as Exhibit 4.  Please review this document.  So as
8   you can -- have you had a chance to review it?
9      A.   Correct; yes.
10     Q.   As you can see, this is a document from the
11  Nevada Secretary of State, and it concerns EMP Media, Inc.
12  If you turn to Page 3, the Articles of Incorporation,
13  FTC-EX-3.
14     A.   Okay.
15     Q.   You'll see that's your name listed as
16  president; correct?
17     A.   Correct; yes.
18     Q.   And is this your signature at the bottom?
19     A.   Yes.
20     Q.   And this was in August of 2008.  Where did
21  you -- do you remember where you completed this paperwork?
22     A.   I might have --
23          MR. JUHASZ:  Don't say you might have.  You
24  either remember or you don't.
25     A.   Yeah.  I don't remember where I completed it,

                                                                    43
1   no.
2      Q.   Did Shad Applegate provide you this paperwork
3   to complete?
4      A.   Yes.
5      Q.   If you turn to Page FTC-EX-0005.
6          MR. JUHASZ:  Neil, do you see the little
7   Bates numbers down there?
8      A.   Yes.
9      Q.   The name Burak Baskan is listed as president;
10  do you see that?
11     A.   Yes.
12     Q.   Do you know why he was listed as president?
13     A.   No, I do not.
14     Q.   Did you communicate with anyone about the
15  changes of roles that occurred?
16     A.   No.
17     Q.   If you flip to Page FTC-EX-00011, you'll see
18  that Shad Applegate is listed as president, secretary,
19  treasurer, and director; do you see that?
20     A.   Yes.
21     Q.   Do you know why these change in roles occurred
22  on the corporate papers?
23     A.   No, I do not.
24     Q.   Were you informed of these changes?
25     A.   No.

                                                                    44
1      Q.   Did it in any way impact the salary of $1,000 a
2   month and the monthly car payments you received?
3      A.   No.
4      Q.   Please flip to Page 12.  Do you see the name
5   Dena Renee Wright listed as president?
6      A.   Yes.
7      Q.   Does this refresh your memory about who this
8   person might be?
9      A.   No.  Never met her.
10     Q.   Have you ever heard of her?
11     A.   Just through, you know, these -- these demands
12  that you sent, yeah.
13     Q.   Okay.  If you flip to Page 14, please, of this
14  exhibit.  You'll see the name Bogden Prunes, listed as
15  president?
16     A.   Uh-huh.
17     Q.   And the address of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Does
18  this refresh your memory about who this person is?
19     A.   Yeah.  No, never met him.
20     Q.   And on Page 15 of this Exhibit, B. Lambert is
21  listed as president, secretary, treasurer, and director.
22  Does this refresh your recollection at all --
23     A.   No.
24     Q.   -- of who this would be?
25     A.   No.

11 (Pages 41 to 44)

|  | 45 |
|---|---|
| 1 | Q. And if you flip to Page 18, please, of the |
| 2 | exhibit. Your name is back to being listed as president, |
| 3 | secretary, treasurer, and director. Is that your |
| 4 | signature at the bottom of this Page 18? |
| 5 | A. No, that is not. |
| 6 | Q. Were you aware of these changes being made when |
| 7 | you were listed back as a corporate officer? |
| 8 | A. No, I wasn't aware. |
| 9 | Q. Do you know who filed this document? |
| 10 | A. No, I do not. |
| 11 | Q. Please flip to Page 21 of the exhibit. The |
| 12 | certificate of dissolution. Is that your signature at the |
| 13 | bottom where it was dated July 7th, 2016? |
| 14 | A. No, that's not my signature. |
| 15 | Q. Do you read that to be your name? |
| 16 | A. I don't -- in a way, a little bit, but, I just |
| 17 | knew that it was being dissolved; that's all. |
| 18 | Q. And it says there's a filing fee of $100; |
| 19 | correct, at the bottom here? |
| 20 | A. Yeah. |
| 21 | Q. Did you pay that $100 or no? |
| 22 | A. No. |
| 23 | Q. So you knew the company was going to be |
| 24 | dissolved? |
| 25 | A. Yeah. |

|  | 46 |
|---|---|
| 1 | Q. How did you know it? |
| 2 | A. Through a conversation probably with Shad, |
| 3 | saying that the company -- Shad Applegate, being resolved. |
| 4 | Q. And does this refresh your recollection about |
| 5 | when that conversation occurred? |
| 6 | A. Probably around -- yeah, around that time. |
| 7 | Maybe June '16. |
| 8 | Q. And was any reason beyond the company no longer |
| 9 | being profitable provided for why? |
| 10 | A. Yeah, just dissolving the company. |
| 11 | Q. Were there assets that EMP Media had in its |
| 12 | name when the dissolution occurred? |
| 13 | A. No. |
| 14 |    MR. JUHASZ: No, or do you know? |
| 15 | A. I don't know, but, you know -- |
| 16 | Q. Okay. Go off the record, please. |
| 17 | (A recess was taken) |
| 18 | Q. Back on the record, please. Mr. Infante, are |
| 19 | you familiar with a web site called MyEx.com? |
| 20 | A. No, I'm not. |
| 21 | Q. Have you ever visited the web site, MyEx.com? |
| 22 | A. No. |
| 23 | Q. When you received the Civil Investigative |
| 24 | Demand that mentions MyEx.com, did you Google it or search |
| 25 | it? |

|  | 47 |
|---|---|
| 1 | A. No, I actually didn't. |
| 2 | Q. Are you now aware that it is a web site that |
| 3 | posts pictures and personal information about consumers |
| 4 | that are submitted by other consumers? |
| 5 | A. From -- yeah, from reading the demand. |
| 6 | Q. And do you know that these pictures often |
| 7 | include nude images or sexually explicit images? |
| 8 | A. From reading that, yes. |
| 9 | Q. I've handed you an exhibit marked 5. And I'll |
| 10 | represent that this is the landing page for MyEx.com, as |
| 11 | captured by the Wayback machine for December 11th, 2012. |
| 12 | And you might see that there's some images that have been |
| 13 | not loaded or populated on this representation, but that |
| 14 | it has different entries of submissions. |
| 15 | A. Uh-huh. |
| 16 | Q. And you haven't seen this web site before? |
| 17 | A. No. |
| 18 | Q. I've handed you an exhibit that has been marked |
| 19 | Exhibit 6. Please review this document. Have you had an |
| 20 | opportunity to review it? |
| 21 | A. Yes. |
| 22 | Q. And is this the privacy policy for MyEx.com? |
| 23 | A. I -- |
| 24 | Q. Or I will represent that it is the privacy |
| 25 | policy listed on MyEx.com for a period of time, including |

|  | 48 |
|---|---|
| 1 | as the Wayback machine memorialized as December 31st, |
| 2 | 2012, which is in the upper right-hand corner. Do you |
| 3 | recognize this document? |
| 4 | A. No. |
| 5 | Q. Do you see on the first line under MyEx privacy |
| 6 | policy, that it states EMP Media, Inc., DBA, MyEx, has |
| 7 | created this privacy statement in order to demonstrate its |
| 8 | commitment to customer privacy? |
| 9 | A. Yes. |
| 10 | Q. Do you know who would have drafted this |
| 11 | document for EMP Media, Inc.? |
| 12 | A. No. |
| 13 | Q. And that is the business you're president, |
| 14 | secretary, treasurer, and director of; correct? |
| 15 | A. Yes. |
| 16 | Q. Does this refresh your recollection about |
| 17 | whether EMP Media ever controlled MyEx.com? |
| 18 | A. No; no. |
| 19 | Q. Who would know about this? |
| 20 | A. I would say Burak Baskan and Shad Applegate. |
| 21 | Because it just says has created this privacy statement. |
| 22 | That's -- I mean, that's all I see it as. |
| 23 | Q. Do you know who at the company would have |
| 24 | written this privacy policy? |
| 25 | A. Who -- I'm sorry. Repeat the question. |